**UNITED STATES of America,**

v.

**Leo WEIKERT, Jr., Defendant**

**No. Crim. No. 99–10299–REK.**

United States District Court,
D. Massachusetts.

Feb. 27, 2006.

Brian T. Kelly, United States Attorney's Office, Boston, MA, for U.S.

Terence P. Noonan, Noonan & Noonan, Needham, MA, for Leo Weikert, Defendant.

### Memorandum and Order

KEETON, Senior District Judge.

#### I. Pending Matters

Pending for decision are matters related to the following filings:

(1) Motion for a Preliminary Injunction and Request for Hearing (Docket No. 16, filed November 16, 2005); and

(2) Government's Response and Opposition to Defendant Leo Weikert's Motion for Preliminary Injunction and Government's Request to Revoke Supervised Release (Docket No. 18, filed January 11, 2006).

#### II. Factual and Procedural Background

In 1990, defendant pleaded guilty to one count of conspiracy to possess cocaine with intent to distribute. In August 1999, defendant was charged with escaping from the Western District of Texas, where he had been imprisoned since February 11,

1991. On October 21, 1999, defendant pleaded guilty to one count of escape from custody, and, on January 28, 2000, I sentenced defendant to eight months of imprisonment, to be served consecutively with the term of imprisonment imposed on February 11, 1991. I also sentenced defendant to twenty-four months of supervised release upon release from imprisonment.

Defendant was released from prison on December 10, 2004. Defendant alleges that the Probation Office has notified him of its intent to take a blood sample in order to collect his DNA. On November 16, 2005, defendant filed his Motion for a Preliminary Injunction and Request for Hearing. (Docket No. 16.) On January 11, 2006, the government filed its Response and Opposition to Defendant Leo Weikert's Motion for Preliminary Injunction and Government's Request to Revoke Supervised Release. (Docket No. 18.) These filings are now before me, and I address each of them below.

### III. Analysis

Defendant requests that this court grant a preliminary injunction prohibiting the government from taking a blood sample in order to enter his DNA into the Combined DNA Index System Database ("CODIS") operated by the Federal Bureau of Investigation ("FBI"). Within the First Circuit, the applicable standard for deciding motions for preliminary injunction ordinarily requires the trial court to consider whether the party seeking the preliminary injunction has met its burden of showing that (i) plaintiff has a likelihood of success on the merits; (ii) irreparable harm is likely to occur if the injunction is not granted; (iii) the harm likely to occur to the plaintiff in the absence of an injunction outweighs any hardship that would be inflicted on the other party by an injunction; and (iv) the public interest will not be adversely affected by the injunction. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996). I will address each of these four factors in turn in order to determine whether defendant has met his burden in requesting a preliminary injunction.

### A. Likelihood of Success on the Merits

Defendant argues that the forced extraction of his blood and DNA, absent a warrant or individualized suspicion, violates the Fourth Amendment. The government contends that "all of the cases decided to date have rejected the arguments now being made by Weikert." (*See* Docket No. 18 at 1) (emphasis in original).

Although the government is correct that the circuits that have considered the statute that permits defendant to be required to provide a blood sample have all upheld it, the District of Massachusetts is not in any of these circuits. Indeed, neither the First Circuit nor the Supreme Court has yet ruled on the constitutionality of the federal statute in question. Therefore, although I can look to rulings of the other circuits for persuasive authority, *see, e.g., Powell v. Alexander*, 391 F.3d 1, 24 (1st Cir.2004), they do not have the weight of binding precedent. Since the constitutionality of the statute under which defendant is being required to provide a blood sample is an issue of first impression in this circuit, I am not bound by any precedent and must instead determine whether defendant is likely to prevail in the First Circuit on his claim that forced extraction of his DNA is a violation of the Fourth Amendment.

The First Circuit has held that the sine qua non of the four-part preliminary injunction inquiry is likelihood of success on the merits. *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir.2002) (stating that "if the moving party

cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity"). The analysis of this first factor is thus essential for determining whether I should grant the preliminary injunction that defendant requests.

### 1. DNA Act

Pursuant to the DNA Analysis Backlog Elimination Act of 2000 ("DNA Act"), 42 U.S.C. § 14135a (2004), defendant is required to submit a DNA sample. The DNA Act, as amended by Congress on January 5, 2006, provides that "the probation officer responsible...may use or authorize the use of such means as are reasonably necessary to detain, restrain, and collect a DNA sample from an individual who refuses to cooperate in the collection of the sample." 42 U.S.C. § 14135a(a)(4)(A). "DNA sample" is defined as "a tissue, fluid, or other bodily sample of an individual on which a DNA analysis can be carried out." 42 U.S.C. § 14135a(c)(1). The DNA Act further provides that "[t]he probation office responsible for the supervision under Federal law of an individual on probation, parole, or supervised release shall collect a DNA sample from each such individual who is, or has been, convicted of a qualifying Federal offense (as determined under subsection (d) of this section)." 42 U.S.C. § 14135a(a)(2). Subsection (d) defines "qualifying Federal offenses" to include:

(1) Any felony.

(2) Any offense under chapter 109A of Title 18.

(3) Any crime of violence (as that term is defined in section 16 of Title 18D).

(4) Any attempt or conspiracy to commit any of the offenses in paragraphs (1) through (3).

42 U.S.C. § 14135a(d).

These DNA samples go into CODIS, "a massive centrally-managed database linking DNA profiles culled from federal, state, and territorial DNA collection programs, as well as profiles drawn from crime-scene evidence, unidentified remains, and genetic samples voluntarily provided by relatives of missing persons." *United States v. Kincade,* 379 F.3d 813, 819 (9th Cir.2004) (en banc), *cert. denied,* 544 U.S. 924, 125 S.Ct. 1638, 161 L.Ed.2d 483 (2005). The data stored in CODIS is used to (i) match one forensic crime scene sample to another forensic crime scene sample; and (ii) match evidence obtained at the scene of a crime to a particular offender's profile, thereby allowing the FBI to monitor the criminal activity of known offenders. *See id.* at 829–30. Escape from custody, one of the offenses for which defendant is on supervised release, is a felony, 18 U.S.C. § 751(a), and thus qualifies under 42 U.S.C. § 14135a(d)(1). Consequently, if this court holds the DNA Act to be constitutional as applied to defendant, defendant must comply with this statute and provide the requested blood sample. I can only require this, however, after determining whether the DNA Act is constitutional as applied to individuals on supervised release for whom there is no individualized suspicion of having committed other crimes. If the DNA Act is unconstitutional as applied to individuals situated similarly to defendant, defendant cannot be forced to submit a sample pursuant to its requirements.

### 2. Fourth Amendment Analysis

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The forced extraction of blood constitutes a "search" under the Fourth Amendment. *See Skinner v. Rail-*

*way Labor Executives' Association*, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (stating that "it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of [the individual's] privacy interests"). The Fourth Amendment, however, protects against only those searches that are deemed unreasonable. *See id.* at 619, 109 S.Ct. 1402. A determination of whether a search is unreasonable "depends on all of the circumstances surrounding the search...and the nature of the search...itself." *Id.* (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)).

The Courts of Appeals that have considered the constitutionality of compelled DNA testing under the Fourth Amendment have differed over how to analyze the reasonableness of the search involved. *See Nicholas v. Goord*, 430 F.3d 652, 659 (2d Cir.2005) (compiling methods used by different Circuits in deciding DNA testing cases). The two options between which Courts of Appeals have chosen are the special needs test first outlined by Justice Blackmun in his concurrence in *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring), and the general Fourth Amendment balancing test that weighs the interests of the government against those of the individual. *See Nicholas*, 430 F.3d at 659 (stating that "[t]he Second, Seventh, and Tenth Circuits have applied the special-needs test [and the] Third, Fourth, Fifth, Ninth, and Eleventh Circuits have applied a general balancing test"). The Courts of Appeals split both over which test is appropriate and over which test is more stringent. *See id.* at 664 n. 22 (referring to "the more stringent special-needs

test" and stating that "[w]e find puzzling the Third Circuit's comment...that the special-needs inquiry is *less* rigorous than the general balancing test") (emphasis in original); *United States v. Sczubelek*, 402 F.3d 175, 184 (3d Cir.2005) (referring to "the more rigorous...totality of the circumstances test rather than the...special needs exception"); *Kincade*, 379 F.3d at 844 (Reinhardt, J., dissenting) (referring to the "narrower...legal theory" of the special needs test). After considering the Supreme Court's recent Fourth Amendment jurisprudence, however, I find that the special needs test is the appropriate analysis in this case.

In his *T.L.O.* concurrence, Justice Blackmun stated that the normal Fourth Amendment requirements of a warrant and probable cause should be excused only when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *T.L.O.*, 469 U.S. at 351, 105 S.Ct. 733 (Blackmun, J., concurring). Although *T.L.O.* itself did not involve a suspicionless search, the special needs doctrine has evolved to be the proper form of analysis for searches without individualized suspicion. *See Chandler v. Miller*, 520 U.S. 305, 313, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (stating that "[t]o be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing [but that] particularized exceptions to the main rule are sometimes warranted based on special needs, beyond the normal need for law enforcement") (internal quotations omitted). The Supreme Court has clarified the use of the special needs test in three recent cases: *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), and *Illinois v.*

*Lidster*, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004).

In *Edmond*, the Court held unconstitutional an Indianapolis checkpoint program "whose primary purpose [was] the discovery and interdiction of illegal narcotics." 531 U.S. at 34, 121 S.Ct. 447. The Court explained that it had "upheld certain regimes of suspicionless searches where the program was designed to serve special needs, beyond the normal need for law enforcement [or to achieve] certain administrative purposes," *id.* at 37, 121 S.Ct. 447 (internal quotations omitted) (including seizures of motorists at a fixed Border Patrol checkpoint and a sobriety checkpoint as permissible exceptions), and that the checkpoint at issue in the case was not designed to serve such special needs, *id.* at 40–42, 121 S.Ct. 447.

In *Ferguson*, the Court held unconstitutional a hospital program that administered urinalysis to pregnant women. 532 U.S. at 86, 121 S.Ct. 1281. The Court again applied the special needs test since these were suspicionless searches, *id.* at 79, 121 S.Ct. 1281, and it found that the special need was not sufficient to warrant the intrusion on the pregnant women's privacy, *id.* at 83, 121 S.Ct. 1281 (finding that the "immediate objective of the searches was to generate evidence for law enforcement purposes"). The Court in *Ferguson* also emphasized that courts applying the special needs test should look at the immediate objective of the search in question rather than the ultimate purpose. *Id.* at 84, 121 S.Ct. 1281 (stating that "[b]ecause law enforcement involvement always serves some broader social purpose or objective, under respondents' view [of considering the ultimate goal of getting the pregnant women substance abuse treatment], virtually all nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose").

Most recently, the Court in *Lidster* upheld a highway checkpoint set up by police one week after a hit-and-run accident that was "designed to obtain more information about the accident from the motoring public." 540 U.S. at 422, 124 S.Ct. 885. Although the Court did not explicitly mention the special needs test, it focused on the purpose of the checkpoint and distinguished between the "information-seeking kind of stop" at issue in *Lidster* with the stop that served the state's "general interest in crime control" at issue in *Edmond*. 540 U.S. at 424, 124 S.Ct. 885. Together, these cases lead me to find that the special needs test is the appropriate analytical tool for this case, which considers the constitutionality of a search that is not grounded on individualized suspicion.

■ The special needs test is a two-part test in which the court (i) asks whether the statute serves a special need distinct from traditional law enforcement; and, if the search does serve a special need, (ii) weighs the government's special need against the intrusion on the individual's privacy interest. *Nicholas*, 430 F.3d at 664 n. 22.

### 3. Special Need

■ The Supreme Court has made clear that a regime of suspicionless searches is permitted only when "the program [i]s designed to serve special needs, beyond the normal need for law enforcement," or in other individualized exceptions that do not apply here. *Edmond*, 531 U.S. at 37, 121 S.Ct. 447. Although Courts of Appeals in other Circuits have considered the Supreme Court's opinion in *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), to provide valuable guidance in its finding that searches of probationers' homes are justified by proba-

tion officers' special need to supervise probationers, *Sczubelek*, 402 F.3d at 182–83 (citing *Griffin*, 483 U.S. at 873–74, 107 S.Ct. 3164), I find that *Griffin* does not provide guidance in the context of a suspicionless search. *Griffin* addressed whether or not probation officers were permitted to search a probationer's home when they did not have a warrant but had reasonable suspicion. *Griffin*, 483 U.S. at 871, 107 S.Ct. 3164. I thus do not find *Griffin's* holding regarding special needs on point in a case addressing a suspicionless search. The Supreme Court has also held, in the context of a suspicionless search, that stopping motorists to determine whether they are in possession of illegal narcotics is not justified by such a special need, *id.* at 40–42, 121 S.Ct. 447, nor is testing pregnant women to determine drug usage, *Ferguson*, 532 U.S. at 83, 121 S.Ct. 1281. Stopping motorists to gather more information about a recent crime that occurred in their vicinity, however, is justified by a special need. *Lidster*, 540 U.S. at 424, 124 S.Ct. 885.

Applying these precedents, it is clear to me that the government does not have a sufficient special need. Although other courts applying the special needs test have found that the primary purpose of the DNA Act is "to create a DNA database to assist in solving crimes should the investigation of such crimes permit resort to DNA testing of evidence," *Nicholas*, 430 F.3d at 668, such a finding appears to me to be inappropriate in the case before me. The government's immediate purpose in collecting DNA samples is to solve crimes. *See* FBI, Combined DNA Index System Program, *available at* http://www. fbi.gov/hq/lab/codis/ brochure.pdf (last visited February 13, 2006) (stating that "the success of the CODIS program will be measured by the crimes it helps solve"). The government's purpose is not merely the disinterested creation of a database.

Instead, the government's purpose is to obtain information related to possible crimes that the individual subject to the search may have committed. The government's purpose for taking DNA samples is not to get "information about a crime in all likelihood committed by others" than those providing the information, as permitted in *Lidster*, 540 U.S. at 423, 124 S.Ct. 885, but instead to determine whether the searched individual has committed a crime. *See id.* at 423–24, 124 S.Ct. 885 (distinguishing the permitted stops from those in *Edmond* because the primary law enforcement purpose "was *not* to determine whether a vehicle's occupants were committing a crime" and because "[t]he police expected the information elicited to help them apprehend, not the vehicle's occupants, but other individuals") (emphasis in original). In this case, the government's purpose is clearly not "beyond the normal need for law enforcement." *Edmond*, 531 U.S. at 37, 121 S.Ct. 447. I therefore hold that the government will be unlikely to prevail on the merits of its defense since it does not have a special need suitable to justify a suspicionless search. Plaintiff is thus likely to succeed on the merits of his claim.

Although I find that no special need exists in this case, I will continue with the rest of the special needs analysis to determine defendant's likelihood of success on the merits as though a special need existed. This approach seems particularly appropriate since the Courts of Appeals that have applied a special needs analysis have found a special need to exist by characterizing the government's purpose differently, and, arguably, incorrectly. *See Nicholas*, 430 F.3d at 667–669 (arguing that the New York version of the DNA Act is premised on a special need because "the state, in collecting DNA samples, is not trying to determine that a particular individual has engaged in some specific wrongdoing") (in-

ternal quotations omitted). I will therefore first consider the privacy interest in a blood-based DNA sample of individuals on supervised release, and then weigh this private interest against the government's interest in collecting these samples.

### 4. Individual's Privacy Interest

■ The taking of a DNA sample as provided for in the DNA Act unquestionably intrudes on an individual's privacy interest, as does the later analysis of the sample. *See Skinner*, 489 U.S. at 616, 109 S.Ct. 1402. In fact, the later analysis and identifying information that is then stored in CODIS are likely much more of an invasion of an individual's privacy than the initial blood test. As one of the dissenting judges on the Court of Appeals for the Ninth Circuit stated:

> [P]rior cases dealing with the level of intrusion authorized by the taking of blood samples . . . did not confront a regime in which the samples were turned into profiles capable of being searched time and time again throughout the course of an individual's life. . . . The startling advance of technology has magnified the power of the initial search authorized by the DNA Act, such that the invasion of privacy is vastly more significant tha[n] we might have previously assumed. . . . To reduce searches authorized by the DNA Act to the physical act of taking blood would be to ignore the totality of the circumstances surrounding the search and to ignore the manner in which the advance of technology has affected the degree of privacy secured to citizens by the Fourth Amendment.

*Kincade*, 379 F.3d at 867 (Reinhardt, J., dissenting) (internal quotations omitted) (cited in *Sczubelek*, 402 F.3d at 198 (McKee, J., dissenting)). The question before me now is whether the taking and keeping of a DNA sample are intrusions into an individual's privacy interest when the individual in question is on supervised release.

The Supreme Court has held that individuals on probation or on supervised release do not enjoy the same liberties that ordinary citizens enjoy. *See Griffin*, 483 U.S. at 874, 107 S.Ct. 3164 (stating that probationers "do not enjoy the absolute liberty to which every citizen is entitled, but only conditional liberty properly dependent on observance of special probation restrictions") (internal edits and quotations omitted); *see also United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (stating that "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens"). The Court has not, however, specified the exact extent of the limitation on the privacy interest of an individual on supervised release. *See Griffin*, 483 U.S. at 874, 107 S.Ct. 2672 (stating that probation can be "more or less confining depending upon the number and severity of restrictions imposed" and probationers' liberty is limited "[t]o a greater or lesser degree"). The Court has permitted searches of probationers' homes and apartments, but these cases provide limited guidance. First, limiting an individual's privacy interest in intrusion into his or her abode is far different than limiting that same individual's privacy interest in bodily intrusion. Second, the cases addressing searches of probationers' property have dealt with warrantless searches where the officers conducting the searches had reasonable suspicion. In the case before me, the question is not whether individuals on supervised release have a limited privacy interest in a suspicion-based search of their property. It is instead

whether such individuals have a limited privacy interest in a suspicionless invasion into their body and their identity. I therefore find that *Griffin* and *Knights*, although valuable in their assertion that the privacy interests of individuals on supervised release are limited, do not provide sufficient guidance in this case.

Individuals on supervised release, although not in exactly the same situation as those in prison, *see Hudson v. Palmer*, 468 U.S. 517, 525–26, 104 S.Ct. 3194, 82 L.Ed.2d 393 (holding that, although prisoners enjoy many of the protections of the Constitution, they do not have a reasonable expectation of privacy from searches while in prison), still have greater restrictions placed on their liberty than do individuals living freely in society, *see Zadvydas v. Davis*, 533 U.S. 678, 696, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (highlighting the difference between supervised release and complete liberty by differentiating between "living at large" and "supervision under release conditions that may not be violated"). Indeed, supervised release is indeed "part of the sentence," rather than a period tacked onto the end of a sentence already served. 18 U.S.C. § 3583(a) (stating that "[t]he court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment") (emphasis added). Furthermore, the federal statute authorizing courts to sentence individuals to a term of supervised release requires courts to order explicit conditions of supervised release. 18 U.S.C. § 3583(d).

Moreover, if individuals on supervised release violate these conditions, they are subject to further imprisonment and perhaps another later term of supervised release. *See* 18 U.S.C. § 3583(e)(3) (authorizing a judge to "revoke a term of supervised release and require the defendant to serve in prison all or part of the term of supervised release...without credit for time previously served on postrelease supervision, if the court...finds by a preponderance of the evidence that the defendant violated a condition of supervised release"); *see also Johnson v. United States*, 529 U.S. 694, 713, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (finding that judges have the authority to order terms of supervised release following reimprisonment for violation of conditions of original term of supervised release).

Still, individuals on supervised release are not subjected to anywhere near the same restrictions as those in prison. Along with authorizing judges to return individuals on supervised release to prison for violation of their conditions, the statute governing supervised release also authorizes judges to "terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release...if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). Furthermore, although the Supreme Court has restricted prisoners' legitimate privacy interests, this restriction only applied to the extremely limited context of searches of prison cells, *see Palmer*, 468 U.S. at 525–26, 104 S.Ct. 3194 (referring to the "expectation of privacy that a prisoner might have **in his prison cell**") (emphasis added). Individuals on supervised release do not, by definition, have prison cells, so the reasoning underpinning the Supreme Court's limitation of prisoners' legitimate privacy interests in their prison cells does not logically extend to limiting the legitimate privacy interest of individuals on supervised release to the level of prisoners. If such a privacy inter-

est is limited, it is significantly closer to that of the privacy interest of a free individual protected by the Fourth Amendment than to that of a prisoner. I therefore find that the privacy interest in not having a DNA sample taken of an individual on supervised release, while perhaps slightly less than that of a free individual, is still significant given the intrusion involved in taking a blood sample and then storing the information in a government database.

### 5. Weighing of Interests

■ The second part of the two-part special needs test is a balancing test in which the interests of the government in its special need are weighed against the privacy interest of the individual being searched. I will weigh the privacy interest that I found above against a governmental interest in creating a database to investigate crimes. The government's interest is substantial, given the success the government has had in using DNA samples to assist in investigations. As of December 2005, CODIS has aided 30,203 investigations. FBI, Investigations Aided, *available at* http://www.fbi.gov/hq/lab/ codis/aidedmap.htm (last visited February 9, 2006). Of these, 361 were in the District of Massachusetts. FBI, NDIS Statistics, *available at* http://www.fbi.gov/hq/ lab/codis/ clickmap.htm (last visited February 9, 2006).

In cases in which the Supreme Court has weighed the interests of private individuals against those of the government, the Court has held that the balance weighs in favor of the government when the government seeks "to prevent the development of hazardous conditions or to detect violations that rarely generate articulable grounds for searching any particular place or person." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668,

109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). In *Skinner*, the Court allowed the Federal Railroad Administration to administer mandatory blood and urine testing for drug and alcohol usage of its employees after serious railroad accidents. 489 U.S. at 634, 109 S.Ct. 1402. In *Von Raab*, the Court allowed the United States Customs Service to administer urinalysis testing of its employees who were seeking transfer into positions involved in drug interdiction or that required the carrying of firearms. 489 U.S. at 659, 109 S.Ct. 1384. These cases and others that have upheld suspicionless searches when the national interest was sufficiently significant, *see, e.g., United States v. Martinez–Fuerte*, 428 U.S. 543, 566–67, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (allowing suspicionless searches of vehicles along the nation's borders in order to further the national interest in maintaining secure borders), differ from the case before me in one important way. None of the searches in those cases is nearly as intrusive as the mandatory taking of blood and storing of the resulting personal information in a centralized database.

In the Supreme Court case that addressed the forced drawing of an individual's blood, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court allowed the taking of a blood sample of an individual who had been arrested for drunk driving after getting into a car accident. *Id.* at 758, 86 S.Ct. 1826. The police officer who ordered that this blood sample be taken "smelled liquor on petitioner's breath, and testified that petitioner's eyes were 'bloodshot, watery, [and had] sort of a glassy appearance.'" *Id.* at 769, 86 S.Ct. 1826. In permitting the taking of the blood sample, the Supreme Court concluded:

It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an

individual's person is a cherished value of our society. That we today told that the Constitution does not forbid the States minor intrusions into an individual's body **under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.** *Id.* at 772, 86 S.Ct. 1826 (emphasis added). The blood test permitted in *Schmerber,* where the officer ordering the test had a clear basis for his suspicion that petitioner was under the influence of alcohol, is a far cry from the suspicionless blood analysis that defendant is being compelled to undergo.

Although the Court has stated that blood tests "are a commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain," *id.* at 771, 86 S.Ct. 1826, blood tests are without doubt intrusive, *see, e.g., The Merck Manual of Medical Information* 983 (2d ed.2003) (stating in a description of blood donation that "[a]fter the area immediately surrounding the vein is cleaned, a needle is inserted into the vein"). Furthermore, the intrusion on an individual's privacy continues well beyond the taking of blood. The data collected from the DNA sample are not expunged at the end of the individual's supervised release, and the files that are kept for perpetuity are replete with information the scope of which science has not yet discovered. Although Courts of Appeals that have upheld the DNA Act have been quick to point out that the DNA collected under the statute is the "so-called 'junk DNA'—that is, non-genic stretches of DNA not presently recognized as being responsible for trait coding [and that were] purposely selected because they are not associated with any known physical or medical characteristics,"

*Kincade,* 379 F.3d at 818 (internal quotations omitted), these Circuits also admit that "recent scientific studies have begun to question the notion that junk DNA does not contain useful genetic programming material," *id.* at 818 n. 6. Not only is the information itself thus immensely private, but the means of storing this information in a centralized database that could potentially be accessed for improper reasons is itself a significant intrusion on privacy interests. The DNA Act prohibits the misuse of any of the samples collected under its guise. 42 U.S.C. § 14135e. The criminal penalty of a $250,000 fine or one year imprisonment is not, however, sufficient to offset the extreme privacy invasion that could occur were the information in CODIS to get into the wrong hands. Although such an occurrence may seem hypothetical, the dangers of government-controlled centralized databases have shown themselves to be quite real throughout recent history. *See Kincade,* 379 F.3d at 843–44 (Reinhardt, J., dissenting) (referring to, *inter alia,* J. Edgar Hoover's terrorization of civil rights leaders with collected information). The invasion of privacy at issue in this case is therefore severe. Not only does an initial bodily intrusion through the taking of blood occur, but an intrusion into an individual's personal identity through the analysis of that blood also exists, not to mention the danger of a later publicizing of the information gleaned from the sample.

Therefore, although the First Circuit has upheld certain forms of testing, *see Guiney v. Roache,* 873 F.2d 1557, 1558 (1st Cir.1989) (citing *Skinner,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639, and *Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685, and upholding the Boston Police Department's policy of random urinalysis testing of employees who carried firearms or enforced drug laws), I do not

believe that this case history is determinative in a case involving the greater personal intrusion involved in blood testing. I therefore hold that defendant is likely to succeed on the merits of his claim that the DNA Act is a violation of the Fourth Amendment as applied to individuals on supervised release without any individualized suspicion, whether or not a court finds that the government has a special need.

This holding is directly opposed to the findings of the several Circuits that have considered the constitutionality of the DNA Act or similar legislation. *See Nicholas*, 430 F.3d 652 (upholding state DNA statute as applied to prisoners); *Sczubelek*, 402 F.3d 175 (upholding DNA Act as applied to individual on supervised release); *Kincade*, 379 F.3d 813 (upholding DNA Act as applied to individual on supervised release); *Padgett v. Donald*, 401 F.3d 1273 (11th Cir.2005) (upholding state DNA statute as applied to prisoners); *Green v. Berge*, 354 F.3d 675 (7th Cir.2004) (upholding state DNA statute as applied to prisoners); *Groceman v. United States Department of Justice*, 354 F.3d 411 (5th Cir. 2004) (upholding DNA Act as applied to prisoners); *United States v. Kimler*, 335 F.3d 1132 (10th Cir.2003) (upholding DNA Act as applied to individual on supervised release); *Boling v. Romer*, 101 F.3d 1336 (10th Cir.1997) (upholding state statute requiring inmates convicted of offenses involving sexual assault to provide DNA samples before release on parole); *Jones v. Murray*, 962 F.2d 302 (4th Cir.1992) (upholding earlier state DNA statute). As I have shown above, however, I disagree with the reasoning underlying all of these majority or plurality opinions, and believe that the many forceful dissents in these cases are both closer to the Supreme Court's current approach to Fourth Amendment analyses of suspicionless searches and are more reasonable. I do not believe that the government has shown that the DNA Act is justified by a special need separate from traditional law enforcement nor do I find that the government's interest, whether or not it is categorized as a special need, outweighs the privacy interest upon which the DNA Act impinges.

Moreover, many of these cases do not address the situation now before me of the federal DNA Act as applied to an individual on supervised release. The Second, Seventh, Tenth, and Eleventh Circuits all addressed the constitutionality of DNA statutes as applied to *prisoners*. They, as explained above, unquestionably have a lower privacy interest than do individuals on supervised release. Another distinction is that the Second, Fourth, Seventh, Tenth, and Eleventh Circuits all addressed state DNA statutes, many of which had different provisions than does the DNA Act. *See, e.g., Nicholas*, 430 F.3d at 670 (referring to "the New York statute as written"). The only three cases that are directly analogous are thus *Kimler, Sczubelek*, and *Kincade*.

In *Kimler*, the Tenth Circuit devoted only a paragraph to the constitutionality of the DNA Act under the Fourth Amendment and found without further explanation that "[t]he DNA Act, while implicating the Fourth Amendment, is a reasonable search and seizure under the special needs exception to the Fourth Amendment's warrant requirement because the desire to build a DNA database goes beyond the ordinary law enforcement need." 335 F.3d at 1146. In *Sczubelek*, the Third Circuit applied the *Knights* totality of the circumstances test, which I found above to be inapposite for suspicionless searches, to find that the government's interest outweighed the privacy interest of the individual. 402 F.3d at 184. Finally, in *Kincade*, a plurality of the Ninth Circuit applied a totality of the circumstances test to find

that the government's interest outweighed the privacy interest of the individual, 379 F.3d at 839–40, a concurring opinion applied the special needs test to find that the government had a special need that justified the DNA Act, *id.* at 840–41 (Gould, J., concurring), and four judges dissented completely, *id.* at 842. None of these cases is thus sufficiently persuasive. I therefore find that defendant is likely to prevail on the merits of his claim.

## B. Irreparable Injury

■ I find that defendant will clearly suffer irreparable harm if a preliminary injunction is not granted and he is forced to provide a blood sample. A violation of the Fourth Amendment "is fully accomplished by the illegal search…and no exclusion of evidence from a judicial or administrative proceeding can cure the invasion of the defendant's rights." *Pennsylvania Board of Probation and Parole v. Scott*, 524 U.S. 357, 362, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1997). In other words, once defendant's DNA sample has been taken, the intrusion that he hopes to prevent will have taken place, and his DNA will forever be in CODIS. *See* 42 U.S.C. § 14132(d) (providing for the expungement of DNA information from CODIS, but only in the event of reversal or dismissal of conviction). Defendant will therefore suffer irreparable harm if he is forced to give a DNA sample now and his claim is ultimately resolved in his favor.

## C. Balance of Harms

■ In determining whether to grant a preliminary injunction, the court must weigh the harm to the moving party that will result from the denial of the preliminary injunction against the harm to the non-moving party that will result from the preliminary injunction itself. As mentioned above, defendant will suffer the unquestionable harm of having his blood taken against his will. Although the government will suffer the harm of not having defendant's DNA sample in CODIS until this case is resolved, that harm is less significant and ultimately reparable when compared with the harm that defendant will suffer in the absence of a preliminary injunction. Although the absence of one DNA sample from the 2,952,820 samples that were in the system as of December 2005, FBI, NDIS statistics, *available at* http://www.fbi.gov/ hq/ lab/ codis/clickmap.htm (last visited February 9, 2006), could potentially hinder the government's law enforcement capabilities, such an effect seems unlikely, particularly since the FBI was successfully solving crimes without such assistance before CODIS was implemented as a pilot project in 1990, FBI, Mission Statement & Background, *available at* http:// www.fbi.gov/ hq/lab/ codis/ program.htm (last visited February 9, 2006). The balance of harms thus weighs in favor of granting the preliminary injunction.

## D. Public Interest

■ The final factor to be considered in determining whether to issue a preliminary injunction is whether the injunction would be adverse to the public interest. The injunction would not be adverse to the public interest for two independent reasons. First, although he is a convicted felon, defendant has served his time in prison and has apparently abided by all other terms of his supervised release. Second, the public interest in fact favors the granting of the preliminary injunction since the public has a significant interest in upholding the protections of the Fourth Amendment. *See, e.g., Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (stating that the

basic purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials").

I thus find that defendant has satisfied all four factors of the First Circuit's preliminary injunction inquiry. I hereby issue the requested preliminary injunction and order the parties to confer with the Clerk to schedule a hearing on defendant's claim.

Given my holding that defendant's claim has merit, I deny the government's request to revoke defendant's supervised release for failure to provide a DNA sample, as provided in 42 U.S.C. § 14135a(5)(A).

### ORDER

For the foregoing reasons, it is ORDERED:

(1) Motion for a Preliminary Injunction and Request for Hearing (Docket No. 16) is ALLOWED;

(2) Government's Response and Opposition to Defendant Leo Weikert's Motion for Preliminary Injunction and Government's Request to Revoke Supervised Release (Docket No. 18) is DENIED; and

(3) The Clerk is ordered to enter the following Preliminary Injunction:

In accordance with and for the reasons stated in this court's Memorandum and Order issued on this same date, it is hereby ORDERED as follows:

The Probation Office is prohibited from requesting a DNA sample from Leo Weikert, Jr., until this or a higher court has instructed otherwise.