2007 ME 112

**STATE of Maine**

v.

**Richard CORMIER.**

Supreme Judicial Court of Maine.

Argued: Jan. 25, 2006.

Decided: Aug. 14, 2007.

Stephanie Anderson, District Attorney, Julia A. Sheridan, Asst. Dist. Attorney, Portland, for State.

Glen L. Porter, Esq., Eaton Peabody, Bangor, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS,

LEVY, and SILVER, JJ.*

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, and SILVER, JJ.

Dissent: CALKINS, and LEVY, JJ.

SAUFLEY, C.J.

[¶ 1] When a motor vehicle collision is so severe that people are killed or may die, Maine law requires law enforcement officials to test the blood of all drivers for intoxicants. 29–A M.R.S. § 2522(1), (2) (2006). This appeal requires us to determine whether the statute's procedures, which in some instances allow the admission of those blood test results in a criminal trial of the driver, 29–A M.R.S. § 2522(3) (2006), violate the Fourth Amendment of the United States Constitution.

[¶ 2] Specifically, the State appeals from a judgment of the Superior Court (Cumberland County, *Fritzsche, J.*) granting Richard Cormier's motion to suppress the results of a blood test administered pursuant to 29–A M.R.S. § 2522 (2006) on the ground that Cormier's blood was drawn in violation of the Fourth Amendment. Because we agree with the State that the operation of the mandatory testing statute does not violate the Fourth Amendment, we vacate the court's judgment of suppression and remand the matter for further proceedings to determine whether the results of the blood test are admissible in this matter pursuant to the statute.

I. BACKGROUND

[¶ 3] The facts of this case relevant to the dispute before us are not disputed on appeal. On the afternoon of May 11, 2003, Cormier was driving a car that was involved in a head-on motor vehicle collision. Two occupants of the other vehicle died as a result of that collision. Cormier was transported to the hospital by ambulance. The police and paramedics did not, at the scene of the accident, smell alcohol on Cormier or observe anything that would indicate that he was under the influence of alcohol.

[¶ 4] Acting in accordance with 29–A M.R.S. § 2522(1),[1] a State Police detective sought to obtain a blood sample from Cormier for the purpose of testing for the presence of alcohol or drugs. A phlebotomist for the State was called to the hospital to draw Cormier's blood. Without obtaining Cormier's consent,[2] the detective informed Cormier that he was there to obtain a blood sample, and the phlebotomist drew Cormier's blood. During the blood draw, Cormier told the detective that he had consumed one alcoholic drink earlier in the day. The blood-alcohol test revealed that Cormier's blood-alcohol content was .08%.

[¶ 5] Cormier was indicted on two counts of manslaughter (Class A), 17–A M.R.S. § 203(1)(A) (2006); one count of aggravated assault (Class B), 17–A M.R.S. § 208(1)(B), (2) (2006); one count of aggravated OUI (Class C), 29–A M.R.S.A.

* Justice Howard H. Dana Jr. sat at oral argument and participated in the initial conference but retired before this opinion was certified.

1. Title 29–A M.R.S. § 2522(1) (2006) provides that,
 [i]f there is probable cause to believe that death has occurred or will occur as a result of an accident, an operator of a motor vehicle involved in the motor vehicle accident shall submit to a chemical test ... to determine blood-alcohol level or drug concentration in the same manner as for OUI.

2. Although the issue of consent was disputed at the hearing, the State does not challenge the court's finding that there was no consent.

§ 2411(6) (Supp.2003);[3] and one count of reckless conduct with a dangerous weapon (Class C), 17–A M.R.S.A. §§ 211, 1252(4) (1983 & Supp.2003).[4] Cormier moved to suppress the results of the blood test. After an evidentiary hearing, the court granted Cormier's motion. The court found that Cormier had not consented to the blood draw and that the police had not obtained sufficient evidence before the blood test was taken to establish probable cause to believe that Cormier had operated a motor vehicle while under the influence of intoxicants. The court found that the only justification for the blood test was section 2522, which mandates a test when an accident has resulted in a fatality. Relying on the United States Supreme Court's decision in *Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), the court declared section 2522(3), the subsection that addresses admissibility of the test results, unconstitutional as it applied to Cormier. It concluded that the result of Cormier's blood test was inadmissible in light of the " 'Fourth Amendment's general prohibition against nonconsensual, warrantless, and suspicionless searches.' " (Quoting *Ferguson,* 532 U.S. at 86, 121 S.Ct. 1281.) The State appeals pursuant to 15 M.R.S. § 2115–A (2006) and M.R.App. P. 2(a)(4) and 21.

## II. DISCUSSION

[¶ 6] We are, accordingly, called upon to examine the constitutionality of the Maine statute that allows the admission, in certain circumstances, of blood test results against drivers involved in motor vehicle accidents resulting in, or likely to result in, a fatality. 29–A M.R.S. § 2522(3). We begin by examining the purpose and function of section 2522. We then review the application of Fourth Amendment principles to the statute.

### A. The Statutory Context for Mandating Blood Testing in Fatal Accidents

[¶ 7] The National Highway Traffic Safety Administration reports that in 2005, 225 drivers were involved in fatal vehicle accidents in Maine and that an estimated twenty-three percent of those drivers had alcohol in their blood. NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., NAT'L CTR. FOR STATISTICS & ANALYSIS, TRAFFIC SAFETY FACTS: STATE ALCOHOL ESTIMATES 7 (2005). Of the estimated fifty-two drivers with alcohol in their systems, forty-five were estimated to have had blood-alcohol levels of .08% or greater. *Id.* Because of incomplete data, these figures were only estimates based on a statistical model. *Id.* at 1. As NHTSA noted, "Missing data can result for a number of reasons, the most frequent of which is that persons are not always tested for alcohol." *Id.*

[¶ 8] The Maine Legislature, aware of the dire consequences of drunk driving, has enacted exacting standards for drivers and law enforcement officials that are designed to reduce alcohol-related deaths on Maine roads. Recognizing the need for more complete information about the involvement of alcohol in serious and fatal accidents, the Legislature has mandated blood-alcohol testing for any driver involved in an accident in which there is probable cause to believe a death has occurred or will occur:

---

**3.** The accident occurred before the repeal of 29–A M.R.S.A. § 2411(6) (Supp.2003). *See* P.L.2003, ch. 452, § Q–83 (effective July 1, 2004).

**4.** The accident occurred before the Legislature amended 17–A M.R.S.A. § 1252(4) (1983). *See* P.L.2005, ch. 527, § 17 (effective Aug. 23, 2006) (codified at 17–A M.R.S. § 1252(4) (2006)).

**Mandatory submission to test.** If there is probable cause to believe that death has occurred or will occur as a result of an accident, an operator of a motor vehicle involved in the motor vehicle accident shall submit to a chemical test ... to determine blood-alcohol level or drug concentration in the same manner as for OUI.

29–A M.R.S. § 2522(1). Even if the driver is the person who died at the scene, the testing is mandated nonetheless. *See id.* § 2522(1), (2). The testing of drivers is thus required after a fatal accident without regard to the possibility that the driver may be prosecuted. This mandatory testing adds to the State's body of knowledge regarding the effects of driving in Maine while under the influence of alcohol or drugs and allows the Legislature to be more informed as it shapes policy.

[¶ 9] Taking into account the potential for the blood test results to be used against a driver in a criminal proceeding, however, the statute goes on to limit the admissibility of the blood test results at a criminal trial to circumstances in which evidence independent from the test would demonstrate probable cause to believe that the operator was under the influence of intoxicants:

**Admissibility of test results.** The result of a test is admissible at trial if the court, after reviewing all the evidence, whether gathered prior to, during or after the test, is satisfied that probable cause exists, independent of the test result, to believe that the operator was under the influence of intoxicants at the time of the accident.

*Id.* § 2522(3).

[¶ 10] Thus, the statute allows for the admission of the test results only when there exists independent probable cause to believe that the driver was operating under the influence. Unique to this statute is the Legislature's authorization of law enforcement to determine whether probable cause existed at the time of the test through evidence gathered *after* the test had been taken.

[¶ 11] Cormier's blood test results were gathered pursuant to section 2522. There is no dispute that the test results were obtained through a search conducted without Cormier's consent, without a warrant, and without the determination of probable cause *before* the test was administered. On these facts, the court concluded that the statute was unconstitutional as it was applied to Cormier, and the court granted Cormier's motion to suppress. We now review the court's legal conclusions regarding Maine's mandatory blood testing statute de novo. *See State v. Reynoso–Hernandez,* 2003 ME 19, ¶¶ 11–12, 816 A.2d 826, 830.

B. Review of the Court's Ruling on the Motion to Suppress

[¶ 12] In reviewing the court's suppression order, we confront two questions: (1) do the provisions of section 2522 result in an unreasonable search that violates the Fourth Amendment, thereby requiring suppression of the test results; and (2) if the statute comports with the Fourth Amendment, did the motion court determine whether the State had established probable cause pursuant to 29–A M.R.S. § 2522(3)?

1. Does Section 2522(3) Violate the Fourth Amendment?

[¶ 13] We have previously, if briefly, addressed the legal question presented here, holding that the predecessor to section 2522(3) permits the admission of blood test results when, before, during, or after the administration of the mandatory blood test, information comes to light that establishes probable cause to believe that the

operator involved in the accident was operating while intoxicated. *See State v. Roche,* 681 A.2d 472, 474–75 (Me.1996); *State v. Bento,* 600 A.2d 1094, 1096 (Me. 1991). Although we recognized in *Roche* that other courts had treated similar statutes more restrictively, we refused to adopt their approach. *Roche,* 681 A.2d at 475. We do not disturb our holdings in *Bento* and *Roche* today.

[¶ 14] The Fourth Amendment of the United State Constitution protects the "right of the people to be secure ... against unreasonable searches and seizures." U.S. CONST. amend. IV. Evidence that is obtained through an unreasonable search is subject to suppression; that is, it cannot be used against a defendant in a criminal trial. *See Schmerber v. California,* 384 U.S. 757, 766, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *see also Reynoso–Hernandez,* 2003 ME 19, ¶ 6, 816 A.2d at 829. The reasonableness of a search is generally assured through an officer's procurement of a warrant issued upon the demonstration of probable cause, *see Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), or through the individual's consent to the search, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 227–28, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

[¶ 15] The absence of consent or a warrant does not, however, dispose of the question of the reasonableness of a search. Courts have articulated several exceptions to the warrant "requirement." *See Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *United States v. McCargo,* 464 F.3d 192, 196 (2d Cir. 2006). We address three of those exceptions here: inevitable discovery, exigent circumstances, and special needs.

[¶ 16] Each of these three exceptions has been upheld by the United States Supreme Court as a legitimate exception to the requirement that a warrant be obtained before conducting a nonconsensual search.[5] Each has some applicability to the matter before us. Because the exceptions are related, and because of the unique nature of the statute before us, we address all of these exceptions.

a. Inevitable Discovery and Exigent Circumstances

[¶ 17] The inevitable discovery exception permits the admission of evidence obtained without a warrant if (1) the evidence could also have been gained lawfully from information that is truly independent from the warrantless search, and (2) the evidence inevitably would have been discovered by such lawful means. *See State v. Storer,* 583 A.2d 1016, 1019–20 (Me.1990). The exigent circumstances exception, in contrast, allows the admission of evidence obtained through a warrantless search if the search is necessary to "prevent ... the destruction of relevant evidence ... or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

[¶ 18] We recognize that a search authorized by section 2522 does not fall neatly into either of these exceptions. The inevitable discovery exception is usually understood to apply to evidence that would have been found later, through other legit-

---

5. *See Brigham City, Utah v. Stuart,* —— U.S. ——, ——, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006) (exigent circumstances); *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (special needs); *Nix v. Williams,* 467 U.S. 431, 443–48, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (inevitable discovery).

imate means, and, obviously, the blood-alcohol content of a driver is a fleeting condition that could not later be recovered. The exigent circumstances exception is ordinarily applicable to a search conducted after determining the existence of probable cause but before a warrant can be obtained.

[¶ 19] Through the enactment of section 2522(3), which allows the probable cause determination required for admissibility to be based on evidence gathered before, during, *or after* the test, *see Bento,* 600 A.2d at 1096, the Legislature has recognized that exigent circumstances are present at a fatal collision site and has codified a narrow and distinct application of the inevitable discovery exception that applies in the absence of probable cause established before the administration of the test, *see id.* (holding that the predecessor to section 2522 did not require probable cause to be established before the administration of a blood test); *Storer,* 583 A.2d at 1019–20 (describing the inevitable discovery exception to the warrant requirement). The statute codifies this narrow application of the inevitable discovery doctrine by requiring officers to collect drug and blood-alcohol content evidence at the scene, but prohibiting the admission of that evidence absent a factual demonstration that, had the exigencies of the fatal collision scene not existed, probable cause to administer the test would have been determined to exist.

[¶ 20] The exigencies that exist at the site of a fatal collision are obvious. When a serious collision, likely to involve a fatality, has just occurred, responding officers are, and should be, occupied with potentially life-saving matters that are more urgent than gathering evidence of intoxication to support the probable cause necessary for a blood test. The officers may also be responsible for assuring that the collision scene does not create greater dangers to other motorists who must travel the same road. The Legislature, in attempting to identify drivers involved in deadly accidents while intoxicated, has also taken into account the chaos inherent at the scene of a fatal, or likely fatal, accident. The statute requires immediate testing, in these narrow circumstances, without the ordinary pause to collect evidence relevant to whether alcohol or drugs might have impaired the driver.

[¶ 21] The statute's legislative history also demonstrates that the Legislature took into account the urgent life-and-death nature of an accident scene in crafting the mandatory drug and blood-alcohol testing legislation. The Legislature initially enacted the statute in the late 1980s. P.L. 1987, ch. 791, § 17 (effective Aug. 4, 1988) (codified at 29 M.R.S.A. § 1312(11)(D) (Supp.1988)). When the statute was under consideration, the Judiciary Committee received testimony, including testimony from the Commissioner of the Department of Public Safety. The Department advocated mandatory blood-alcohol testing of drivers involved in fatal motor vehicle accidents in part "based on the practicalities of a fatal accident scene and the resulting decisional pressures placed on the investigating law enforcement officer." Testimony of Commissioner John Atwood, Department of Public Safety, on L.D. 2395 before the Joint Standing Committee on Legal Affairs 4 (Mar. 14, 1988). The Department elaborated:

> Oftentimes, drivers will appear dazed due to injuries or emotional shock. The officer cannot always accurately assess when the driver's condition is due to alcohol ingestion or some other reason. If he/she makes the determination that it is the latter, fails to take a test and finds out later that he/she was mistaken, then it is too late to give a test. The

alcohol will have been eliminated from the driver's blood.[6]

*Id.*

[¶ 22] The Legislature recently amended section 2522 to require a blood test, rather than allowing the option of a breath test. P.L.2003, ch. 565, § 1 (effective July 30, 2004) (codified at 29–A M.R.S. § 2522(1), (2)). When that legislation was under consideration, the sponsor, Representative Bowles, observed that the scene of an accident is chaotic, and a driver's blood-alcohol or drug content should be determined quickly and accurately:

> The first law enforcement officer responding to an accident scene is typically faced with a series of immediate, possibly life saving decisions. Trying to save a potential victim, offering comfort to survivors, securing the accident scene to prevent additional tragedy and preserve evidence for accident reconstruction investigators are all issues requiring immediate attention. One of the officer's responsibilities is deciding if a fatality has occurred or is likely to occur as a result of the accident. A second priority is trying to determine if a surviving driver appears to be impaired either by alcohol or drug consumption and administering an appropriate test to make this determination. This is often not an easy determination particularly in the case of drivers impaired by drug consumption, both legal and illegal. Additionally, the surviving driver may, because of the severity of his or her injuries, be unavailable for interview for hours and perhaps days following the accident. During this time, facts may come to light in the form of witnesses or forensic evidence that point to a driver's use of substances which may have played a contributing role in causing the accident.

Testimony of Rep. David Bowles on L.D. 1803 before the Joint Standing Comm. on Criminal Justice & Pub. Safety 1–2 (Jan. 28, 2004).

[¶ 23] Thus, the statute requires the test in this limited situation because of "the gravity of the accident" and "the evanescent nature of evidence of intoxication." *Roche,* 681 A.2d at 474.

[¶ 24] Having dealt with the exigencies, the Legislature then provided protections for drivers that incorporate the concepts of inevitable discovery. It did so by narrowly tailoring the statute to allow admission of those test results, in the absence of a warrant, consent, or simultaneous determination of probable cause, only when the State demonstrates probable cause to believe that the accident has resulted, or will result, in a fatality. 29–A M.R.S. § 2522(1). Further, the statute allows the admission of drug and blood-alcohol test results against a defendant only when other independent evidence, gathered before, during, or after the administration of the test, would inevitably have prompted the blood test if the police had had adequate time to investigate and were not otherwise occupied as responders to a scene involving one or more medical emergencies. 29–A M.R.S. § 2522(3); *see Bento,* 600 A.2d at 1096.

[¶ 25] The combined effect of the statutory provisions assures the following. First, the State and NHSTA will always

---

**6.** The United States Supreme Court has also recognized the unique need to administer a blood-alcohol test promptly after a collision has occurred. *Schmerber v. California,* 384 U.S. 757, 766–72, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that an officer did not violate the Fourth Amendment by directing the administration of a blood-alcohol test without first obtaining a warrant because the officer had probable cause to arrest the driver and the blood-alcohol evidence would have been destroyed through the passage of time).

obtain information regarding the intoxication or sobriety of drivers in fatal collisions. Second, the results of mandatory drug and blood-alcohol testing will be admissible in a criminal proceeding against a driver without violating the Fourth Amendment only when the State demonstrates that:

(1) probable cause existed to believe a death had occurred or would occur as a result of the accident, and

(2) either

(a) the defendant consented to the test, or a warrant for the test was properly issued;[7]

(b) the officer had probable cause to believe that the driver was operating under the influence of drugs or alcohol before the test was administered; or

(c) the evidence meets the standard for admissibility established by 29–A M.R.S. § 2522(3), allowing admission when the State demonstrates that evidence, independent of the test, gathered before, during, or after the test, demonstrates the existence of probable cause to believe that the driver was operating under the influence of drugs or alcohol.

[¶ 26] Most critical to our analysis here is part (c). Section 2522(3) allows the admission of the test results, in the absence of consent, a warrant, or the existence of probable cause in advance of the test, only if: (1) the State presents evidence gathered after the fact demonstrating that, but for the exigencies at the scene of the collision, probable cause for the test would have been discovered; and (2) the test would have been administered based on the probable cause established by this independent lawfully obtained information. See 29–A M.R.S. § 2522(3); *Bento*, 600 A.2d at 1096.

[¶ 27] The Fourth Amendment does not prohibit all searches and seizures, only those that are unreasonable. *See Skinner*, 489 U.S. at 619, 109 S.Ct. 1402. With protections drawn from accepted Fourth Amendment jurisprudence built into the statute, we conclude that the admission of the test results, if those protection requirements are met, is not unreasonable and would not violate Cormier's Fourth Amendment rights.

b. Special Needs

[¶ 28] Our analysis could end there. However, because the motion court focused primarily on the special needs exception to the warrant requirement, which was most recently addressed in *Skinner* and *Ferguson,* we go on to address the applicability of that exception as well in determining whether the search of Cormier's person, in the form of the blood test, was unreasonable.

[¶ 29] A special needs analysis requires us to balance the privacy interests of the individual against the governmental interests at stake to assess the practicality of the warrant and probable cause requirements. *See, e.g., Griffin v. Wisconsin,* 483 U.S. 868, 873–75, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). The privacy interests of individuals in the chemical content of their bodies has been addressed frequently, and there is little question that those interests are recognized by the courts and are important liberty interests. *See, e.g., Skinner,* 489 U.S. at 616–17, 109 S.Ct. 1402; *Schmerber,* 384 U.S. at 767–68, 86 S.Ct. 1826.

---

7. Consent is not a prerequisite to the test, nor does the lack of consent, informed or otherwise, preclude admission of the test if other prerequisites to admissibility are met. 29–A M.R.S. § 2522(1)-(3) (2006).

[¶ 30] The compelling need for the Legislature's chosen approach to fatal automobile accidents is equally evident. In NHTSA's report, it has called attention to the lack of hard data available for analysis and has underscored the need to address the problem of intoxicated driving in Maine. NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., NAT'L CTR. FOR STATISTICS & ANALYSIS, TRAFFIC SAFETY FACTS: STATE ALCOHOL ESTIMATES 1, 7 (2005). The Legislature, in addition to enacting section 2522 to supply better information about the involvement of intoxicants in fatal accidents, has addressed the dangers of driver intoxication by criminalizing any level of impairment resulting from intoxication, 29–A M.R.S. § 2411(1–A)(A)(1) (2006); establishing a presumption of impairment if the operator's blood-alcohol exceeds a certain level, 29–A M.R.S. § 2411(1–A)(A)(2) (2006); requiring the suspension of the license of any person who refuses to be tested when there is probable cause to believe the person has operated a motor vehicle under the influence, even in those instances where no fatality has occurred, 29–A M.R.S. § 2521(5) (2006); and requiring those convicted of driving while intoxicated to participate in an alcohol or drug-treatment program, 29–A M.R.S. § 2411(5)(F) (2006). In these ways, the State has signaled the importance of sober and focused driving. No person receiving a driver's license in Maine can do so without learning the laws related to drunk driving and without understanding the State's interest in assuring the sobriety of drivers on Maine roads. *See* 8A C.M.R. 29 250 004–2, § 1(B) (1999) (providing regulations of the Secretary of State that require those seeking a driver's license to pass a test on the contents of the driving examination handbook); SECRETARY OF STATE, STATE OF MAINE MOTORIST HANDBOOK & STUDY GUIDE, 17–26 (2007) (describing Maine's rigorous laws regarding driving while intoxicated).

[¶ 31] The United States Supreme Court first clearly defined the special needs test to require a balancing of the competing individual and governmental interests in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). There, the Supreme Court held that a school administrator's search of a public high school student's purse did not violate the Fourth Amendment because it was a reasonable search in the school setting. *Id.* at 328, 337–48, 105 S.Ct. 733. The court weighed the child's privacy interest against the formidable interest of teachers and administrators in maintaining discipline in the school environment and concluded that the search was reasonable. *Id.* at 337–43, 105 S.Ct. 733.

[¶ 32] More recently, the Supreme Court addressed the special needs exception in reviewing the constitutionality of requiring blood tests of railroad workers involved in major train accidents, *see Skinner*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639, and requiring drug tests of certain pregnant women during prenatal care without their consent, *see Ferguson*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205. Although the Court upheld as reasonable the blood testing of railroad workers after certain major accidents and the admission of their test results in disciplinary proceedings, *see Skinner*, 489 U.S. at 611, 633, 109 S.Ct. 1402, the Court concluded that the public hospital's policy of drug testing certain pregnant women resulted in unreasonable searches that violated the Fourth Amendment, *see Ferguson*, 532 U.S. at 84–86, 121 S.Ct. 1281.

[¶ 33] The *Ferguson* hospital policy provided for the testing of a pregnant woman if she met one of nine criteria, which included prior known drug or alcohol abuse, the existence of certain medical conditions,

the failure to obtain prenatal care, and the late or incomplete procurement of prenatal care. *Id.* at 71 & n. 4, 121 S.Ct. 1281. Although the hospital argued that the policy was excepted from the warrant and probable cause requirements due to special needs separate from the need for law enforcement, *see Skinner,* 489 U.S. at 619, 109 S.Ct. 1402, the Court concluded that the hospital's policy, which threatened the use of the test results for law enforcement purposes, violated the Fourth Amendment. *Ferguson,* 532 U.S. at 71–72, 79–86, 121 S.Ct. 1281.

[¶ 34] The Court distinguished the hospital policy from the Federal Railroad Administration regulations that the Court reviewed in *Skinner. Ferguson,* 532 U.S. at 77–81, 121 S.Ct. 1281. The railroad regulations, which are similar to the statute we examine today, require the blood testing of railroad employees at the scene of any major train accident. *Skinner,* 489 U.S. at 608–09, 109 S.Ct. 1402; 49 C.F.R. §§ 219.201 to .213 (2006). The Court held that these regulations do not violate the Fourth Amendment because they properly balance the extraordinary governmental need to address public safety against the privacy rights of railroad workers who are prohibited from using intoxicants while on duty. *Skinner,* 489 U.S. at 618–33, 109 S.Ct. 1402.

[¶ 35] Although in *Skinner,* the United States Supreme Court did not reach the question presented here, that is, whether the State may use the blood test results during a criminal prosecution, *see Skinner,* 489 U.S. at 621 n. 5, 109 S.Ct. 1402, we conclude that the Maine statute's approval of using test results in prosecutions in only limited circumstances demonstrates that the statute does not have law enforcement as its primary purpose, as did the hospital policy in *Ferguson. See Ferguson,* 532 U.S. at 84, 121 S.Ct. 1281. Like the *Skin-*

*ner* railroad regulations, the statute we construe today differs fundamentally from a hospital policy in which the immediate objective was to generate evidence for law enforcement purposes to coerce a pregnant woman into obtaining substance abuse treatment. 532 U.S. at 77–84, 121 S.Ct. 1281. Pursuant to the Maine statute, the use of test results in court is limited to circumstances in which officers have obtained evidence of probable cause to administer a blood test. 29-A M.R.S. § 2522(3). This limitation demonstrates that the use of the blood test results for prosecution is not the sole purpose of the Maine statute, but rather a joint concern with that of gathering information for policy development.

[¶ 36] Accordingly, we proceed to balance the compelling need of the State to obtain information about the intoxication of drivers involved in fatal, or likely fatal, collisions against the privacy interest of drivers, who are prohibited by law from driving while intoxicated, in the level of alcohol or other intoxicants in their blood. We conclude that the State's interest in gathering information to assist in addressing the problem of intoxicated driving outweighs the privacy interest of drivers in the content of their blood. The State's special needs, separate from the general purpose of law enforcement, justify an exception to the warrant requirement in these circumstances. *See Skinner,* 489 U.S. at 620–21, 629–30, 109 S.Ct. 1402 (holding that the railroad employee blood-testing regulations serve special needs, separate from the general need for law enforcement, to enhance railroad safety, safeguard the public, and gather information about the causes of major accidents, for purposes of prevention).

[¶ 37] Having concluded that section 2522 does not itself violate the Fourth Amendment, we now review the court's

judgment on Cormier's motion to suppress in light of the requirements of the statute.

2. Did the Court Determine Whether the State Established Probable Cause Pursuant to Section 2522(3)?

[¶ 38] The motion court's decision turned on its understanding of *Ferguson*, in which the United States Supreme Court struck down the hospital policy that allowed the warrantless, nonconsensual blood testing of pregnant women *without probable cause* for the search. 532 U.S. at 71–73, 86, 121 S.Ct. 1281. Unlike the hospital policy at issue in *Ferguson*, however, subsection (3) of section 2522 *requires evidence of probable cause*, although the evidence of probable cause may be obtained after the administration of the test. Although the motion court did consider the question of probable cause relative to information known directly before the decision to administer the test, it does not appear from this record that the court addressed the further question generated by the statute, specifically, whether any other independent evidence of probable cause existing at the time of the test was discovered during or after the administration of the test. *See Bento*, 600 A.2d at 1096 (holding that probable cause need not be determined *before* conducting the test).

 [¶ 39] Because the court did not reach this factual question, we vacate the order of suppression and remand the matter to the Superior Court. On remand, the court will determine, as required by 29–A M.R.S. § 2522(3), whether evidence independent of the test results, obtained during or after the administration of the test, establishes that, but for the exigencies of the collision aftermath, the State inevitably would have demonstrated probable cause to believe that Cormier was operating under the influence of intoxicants at the time of the accident. *See* 29–A M.R.S. § 2522(3).

The entry is:

Order of suppression vacated. Remanded for the court to apply 29–A M.R.S. § 2522(3).

LEVY, J., with whom CALKINS, J., joins, dissenting.

[¶ 40] The warrantless search and seizure at issue in this case was authorized by 29–A M.R.S. § 2522 (2006), and was in furtherance of the heightened public interest in deterring individuals from driving while intoxicated, and in prosecuting those who do so at the expense of human life. The majority upholds this provision on the basis of a "compelling need" on the part of the State to collect data, and finds further support for its constitutionality in the inevitable discovery rule and the exigent circumstances exception to the warrant requirement. Because I conclude that the majority's various rationalizations of section 2522 have no support in either fact or law, I respectfully dissent.

[¶ 41] I will address (A) our application of the special needs exception in *State v. Roche*, 681 A.2d 472 (Me.1996), to section 2522's predecessor statute, and the Supreme Court's refinement of the exception in *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001); (B) the Superior Court's reliance on *Ferguson* to conclude that section 2522 is unconstitutional and the majority's conclusion that *Ferguson* does not render section 2522 unconstitutional; and (C) the majority's alternate reliance on the inevitable discovery rule and exigent circumstances exception to uphold the constitutionality of section 2522.

## I. LEGAL ANALYSIS

A. The Special Needs Exception

[¶ 42] We previously upheld the constitutionality of section 2522's predecessor, 29

M.R.S.A. § 1312 (Supp.1992),[8] in *State v. Roche.* In *Roche,* we determined that the same statute, authorizing a routine blood test in circumstances where there was neither probable cause, nor individualized suspicion to believe the driver was intoxicated, was justified by the special needs exception to the probable cause and warrant requirements. 681 A.2d at 474. In reaching that conclusion, we relied on *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 634, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), in which the United States Supreme Court held that federal railroad regulations requiring mandatory blood tests of employees involved in certain major train accidents were reasonable under the special needs exception, even though there was no suspicion of employee impairment. *Roche,* 681 A.2d at 474.

[¶ 43] Since we decided *Roche* in 1996, the Supreme Court revisited the issue of warrantless, nonconsensual searches in *Ferguson,* and refined the application of the special needs exception. The drug tests challenged in *Ferguson* were conducted pursuant to a state hospital policy developed in conjunction with police that mandated drug testing of pregnant patients who met any of the nine criteria identified in the policy. 532 U.S. at 71–72, 121 S.Ct. 1281. Despite the hospital's contention that the ultimate goal of the program was benign rather than punitive because it was intended to coerce drug-abusing women into treatment programs and ultimately help them lead drug-free lives, the Court found that the immediate objective of the searches was to generate and preserve evidence for use in the prosecution of the women in order to reach that goal. *Id.* at 82–84, 121 S.Ct. 1281. This was evident from the policy's attention to chain of custody issues, possible criminal charges, and the logistics of police notification and arrests, as well as from the police and prosecutors' extensive involvement in the day-to-day administration of the policy. *Id.* at 82, 121 S.Ct. 1281. Because the purpose actually served by the searches was "indistinguishable from the general interest in crime control," the Court refused to find the searches justified by the special needs exception. *Id.* at 81, 84, 121 S.Ct. 1281 (quotation marks omitted).

## B. The Superior Court's Application of the Special Needs Exception to Section 2522

[¶ 44] The Superior Court determined that our holding in *Roche* was rendered invalid by the Supreme Court's holding in *Ferguson.* The court concluded that because the police are even more extensively involved in the administration of blood tests under section 2522 than they were in the tests at issue in *Ferguson,* and because the primary purpose of the search mandated by section 2522 is to gather evidence for criminal prosecution, section 2522 violates the Fourth Amendment of the U.S. Constitution and article I, section five of the Maine Constitution.[9]

---

**8.** Title 29 M.R.S.A. § 1312 (Supp.1992) has since been repealed and replaced by P.L. 1993, ch. 683, § A–2 (effective Jan. 1, 1995), which has since been amended by P.L.2003, ch. 565, § 1 (effective July 30, 2004) (codified at 29–A M.R.S. § 2522 (2006)).

**9.** Other courts have likewise found the special needs exception inadequate to support the type of nonconsensual, warrantless, and suspicionless search authorized by Maine's statutes. *See generally Cooper v. State,* 277 Ga. 282, 587 S.E.2d 605 (2003); *McDuff v. State,* 763 So.2d 850 (Miss.2000); *King v. Ryan,* 153 Ill.2d 449, 180 Ill.Dec. 260, 607 N.E.2d 154 (1992), *superseded by statute,* 625 Ill. Comp. Stat. 5/11–501.6 (West 1994), *as recognized in Fink v. Ryan,* 174 Ill.2d 302, 220 Ill.Dec. 369, 673 N.E.2d 281 (1996); *Commonwealth v. Kohl,* 532 Pa. 152, 615 A.2d 308 (1992); *Han-*

[¶ 45] The majority holds that the Superior Court erred in declaring section 2522 unconstitutional because the warrantless, suspicionless search is reasonable and falls within the special needs exception, even after *Ferguson*.[10] The Court distinguishes *Ferguson* on the basis that section 2522's primary purpose is not law enforcement, but is instead the State's compelling need to collect data related to traffic accidents and ultimately improve public safety on Maine roads. The majority therefore concludes that this case is more like *Skinner*, in which the Supreme Court upheld federal railroad regulations mandating blood tests of railroad workers involved in certain major railroad accidents. 489 U.S. at 634, 109 S.Ct. 1402. However, *Skinner* cannot be seen as controlling in light of *Ferguson*'s refinement of the special needs doctrine.

[¶ 46] *Ferguson*, decided twelve years after *Skinner*, refined the special needs exception by placing a limit on what governmental purposes qualify as "special needs" sufficient to do away with the Fourth Amendment protections of the probable cause and warrant requirements. *Ferguson* requires courts to determine whether there exists some compelling reason beyond the State's general interest in crime control to justify such a waiver of Fourth Amendment protections. By dis-

tinguishing *Ferguson* and relying instead on the law of *Skinner*, the majority returns to the time before such limits were placed on the special needs exception.

[¶ 47] Furthermore, *Skinner* is distinguishable from the present case in two important ways. First, as the majority concedes, *Skinner* did not implicate concerns about the reach of law enforcement because it did not address the question of whether the results of the mandatory blood tests would be later admissible in a criminal trial. The only consequence of a positive test for the railroad workers in *Skinner* was dismissal or a nine-month suspension with a hearing if the worker refused the test. 489 U.S. at 606–07, 610–11, 109 S.Ct. 1402.[11]

[¶ 48] Second, the Court in *Skinner* based its decision in large part on its finding that railroad workers have a diminished expectation of privacy because they work in an industry that is highly regulated to ensure safety. *Id.* at 627–28, 109 S.Ct. 1402. Drivers tested pursuant to section 2522 do not share such a diminished expectation of privacy. Although the State may regulate motor vehicles, an individual does not lose one's expectation of privacy due to his or her status as a driver. *See Delaware v. Prouse*, 440 U.S. 648, 662, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

*noy v. State*, 789 N.E.2d 977 (Ind.Ct.App. 2003).

**10.** The majority also suggests that its application of the special needs exception is justified because people "receiving a driver's license in Maine [cannot] do so without ... understanding the State's interest in assuring the sobriety of drivers on Maine roads." *Supra* ¶ 30. While this statement is undoubtedly true, it is beside the point. Receiving a license and knowing of the State's interest in combating drunk driving does not give rise to an actual or implied consent by all drivers in Maine to be subjected to blood testing without probable cause. A driver's appreciation that the State is serious on this issue does not give rise to a

waiver of a fundamental constitutional right. To the extent that the Court intends to suggest that Cormier actually or impliedly consented to the search conducted in this case, it overlooks the Superior Court's factual finding that there was no consent. The State has not challenged this finding on appeal.

**11.** The Court noted that it was unclear whether its decision would be different if evidence collected under the regulatory scheme was routinely used in criminal proceedings. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 621 n. 5, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

[¶ 49] The Superior Court properly determined that the primary purpose of the blood tests authorized by section 2522 is law enforcement, and that such a justification is insufficient to sustain the searches under the Fourth Amendment's special needs exception after *Ferguson.*

[¶ 50] Although the State's interest in data collection, as evidenced by the statute's legislative history, is a justification for section 2522, it is evident that the primary practical purpose of the law is to gather and preserve evidence to be used in prosecutions against those believed to have been operating under the influence of intoxicants or drugs. This is demonstrated by the fact that when the State lab conducts testing on blood samples gathered as a result of this statutory authorization, copies of the results of those tests are forwarded directly to the District Attorney's office and the investigating law enforcement officer, in addition to the Department of Motor Vehicles. *Cf. United States v. Weikert,* 421 F.Supp.2d 259, 265 (D.Mass.2006). The centrality of the law enforcement focus of section 2522 is also evident in subsection (3), which establishes the basis under which the result of a test is admissible at trial.[12] The "trial" to which the statute refers is unquestionably the trial of an individual who, like Cormier, stands accused of crimes associated with drunk driving.

[¶ 51] The law enforcement focus of section 2522 is also borne out by external indicia of legislative intent accompanying its legislative history. In his written testimony in support of L.D. 2395 before the Joint Standing Committee on Legal Affairs, the Co–Chairperson of the Maine Highway Safety Commission wrote in support of the bill's provision regarding mandatory blood-alcohol tests by stating: "It is crucial to the prosecution of vehicular manslaughter cases that blood alcohol levels of the drivers be available as pertinent evidence. We have seen many many times that the cases hinged on this evidence and the person inflicting the carnage going free." Testimony of Albert L. Godfrey Sr., Maine Highway Safety Comm., on L.D. 2395 before the Joint Standing Committee on Legal Affairs (Mar. 11, 1988).

[¶ 52] By overlooking the obvious law enforcement purpose of section 2522 and sustaining the statute's constitutionality on a "compelling need of the State to obtain information," *supra* ¶ 36, the majority creates precedent that could lead to even greater erosion of the Fourth Amendment rights of Maine's citizens. By readily concluding that the State's interest in data collection trumps the liberty interests of individuals protected by the Fourth Amendment, the majority has embraced a new and broad constitutional theory that could justify warrantless and suspicionless searches in innumerable other contexts.

C. The Majority Opinion's Application of the "Inevitable Discovery" Rule and the Exigent Circumstances Exception

[¶ 53] The majority also embraces another new theory—a combined "inevitable discovery/exigent circumstances exception"— to uphold the constitutionality of section 2522, notwithstanding the fact that the State did not make this argument on appeal. For the reasons that follow, neither the inevitable discovery rule, nor the exigent circumstances exception validates the

---

**12.** Title 29–A M.R.S. § 2522(3) provides:

3. Admissibility of test results. The result of a test is admissible at trial if the court, after reviewing all the evidence, whether gathered prior to, during or after the test, is satisfied that probable cause exists, independent of the test result, to believe that the operator was under the influence of intoxicants at the time of the accident.

otherwise unlawful warrantless searches and seizures the statute permits.

### 1. Inevitable Discovery Rule

[¶ 54] The majority concludes that section 2522 survives constitutional scrutiny in part because the admissibility of the blood tests it authorizes are subject to a codification of the inevitable discovery rule in subsection 2522(3). The inevitable discovery rule allows evidence acquired as a result of an illegal search to be admitted at trial where the government can show, by a preponderance of the evidence, that the unlawfully obtained evidence would have been inevitably discovered through lawful means. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

[¶ 55] The warrantless and suspicionless search that section 2522 authorizes results in the preservation of an operator's blood sample at a particular moment in time. It is physically impossible for the same sample to be subsequently and inevitably discovered later in time because of the effect that the passage of time has on an operator's blood-alcohol content. *See generally* 2 RICHARD E. ERWIN, DEFENSE OF DRUNK DRIVING CASES § 15.08 (3d ed.2006) (explaining the effects of time on blood-alcohol content). Therefore, the inevitable discovery rule cannot be a valid basis to admit the test results of an unlawfully obtained blood sample, where probable cause has been developed long after the blood sample was seized.[13]

[¶ 56] The lack of any authority supporting the majority's expansive reformulation of the inevitable discovery rule is telling. The only decision the Court cites in support of its conclusion that after-acquired probable cause is sufficient to sustain the constitutionality of the blood tests authorized by section 2522 and admit the test results at trial is *State v. Bento,* 600 A.2d 1094 (Me.1991). However, in *Bento* we simply interpreted section 2522's predecessor to determine the meaning of its probable cause requirement and remanded the case to the trial court to resolve inconsistent factual findings. *Id.* at 1097. We explicitly declined to reach the constitutionality of the statutory provision requiring suspicionless blood tests. *Id.* Other courts that have ruled on the constitutionality of similar searches have upheld those searches only if they are based on no less than a reasonable suspicion to believe the defendant was intoxicated at the time of the administration of the test.[14]

---

**13.** I disagree with the majority's application of the inevitable discovery rule only to the extent that the opinion states that the results of a warrantless, suspicionless blood test can be admitted against a criminal defendant based on an after-acquired finding of probable cause. I do not address whether a finding of probable cause based on evidence "gathered ... during ... the test" could sustain the otherwise unlawful search, because such a determination is dependent on a variety of factors. *See* 29–A M.R.S. § 2522(3). One can imagine factual circumstances in which probable cause may develop simultaneously with the unlawful blood test, such that law enforcement officers would have a lawful and independent basis for conducting the test, and the timing would be such that the results of the test would be substantially the same. In such a situation, it is possible that the results of that unlawful test would have been inevitably discovered through lawful means. However, we do not face that factual situation in this case, because the State failed to prove at the suppression hearing that probable cause had developed during the blood test or at any other time.

**14.** *See generally United States v. Chapel,* 55 F.3d 1416 (9th Cir.1995); *Gov't of Virgin Islands v. Quinones,* 301 F.Supp. 246 (D.Vi. 1969); *State v. Steimel,* 921 A.2d 378 (N.H. 2007); *Commonwealth v. Kohl,* 532 Pa. 152, 615 A.2d 308 (1992); *People v. Duemig,* 620 P.2d 240 (Colo.1980); *State v. Aguirre,* 295 N.W.2d 79 (Minn.1980); *State v. Heintz,* 286 Or. 239, 594 P.2d 385 (1979); *State v. Dewey,* 272 N.W.2d 355 (Minn.1978); *State v. Oever-*

## 2. Exigent Circumstances

[¶ 57] The exigent circumstances exception to the warrant requirement applies when "there is adequate probable cause for the seizure and insufficient time for the police to obtain a warrant." *State v. Alley,* 2004 ME 10, ¶ 15, 841 A.2d 803, 808. Probable cause must exist at the time the search or seizure is conducted. The majority states that "[t]he exigent circumstances exception is *ordinarily* applicable to a search conducted after determining the existence of probable cause," but cites no support for the notion that courts applying the exception have disposed of the requirement of probable cause. *Cormier,* 2007 ME 112, ¶ 18, 928 A.2d 753 at 759 (emphasis added). Because the exigent circumstances exception does not apply when probable cause has not been generated until after the search or seizure, the search authorized by section 2522 cannot be sustained on this basis. To do so creates an end run around the probable cause requirement that is inconsistent with the Fourth Amendment and article I, section five of the Maine Constitution.

## II. CONCLUSION

[¶ 58] Section 2522 cannot be sustained on the basis of the State's interest in collecting data on drunk driving when its primary purpose is to collect evidence to be used in criminal prosecutions for drunk driving related crimes. Section 2522 also cannot be sustained on the basis of a combination of the exigent circumstances exception to the warrant requirement and the inevitable discovery rule. The exigent circumstances exception requires the existence of probable cause at the time of the search, and section 2522 impermissibly allows after-acquired probable cause to justify an earlier warrantless search. Furthermore, the inevitable discovery rule is not so elastic as to authorize the admission of evidence that could not have been inevitably discovered.

[¶ 59] The majority's opinion leads the law into new, uncharted territory in which probable cause—a cornerstone of the Fourth Amendment—plays a secondary, after-the-fact role. Notwithstanding section 2522's proper and noble purpose, I conclude that to the extent the statute authorizes searches and seizures based on after-acquired probable cause, the statute is unconstitutional on its face. The judgment of the Superior Court should be affirmed.

*ing,* 268 N.W.2d 68 (Minn.1978); *State v. Graham,* 278 So.2d 78 (La.1973); *De Vaney v. State,* 259 Ind. 483, 288 N.E.2d 732 (1972); *People v. Fidler,* 175 Colo. 90, 485 P.2d 725 (1971); *State v. Kuljis,* 70 Wash.2d 168, 422 P.2d 480 (1967); *People v. Lukach,* 263 Ill. App.3d 318, 200 Ill.Dec. 714, 635 N.E.2d 1053 (1994); *State v. Curtis,* 106 Idaho 483, 680 P.2d 1383 (1984); *State v. Williams,* 4 Kan.App.2d 651, 610 P.2d 111 (1980); *State v. Bentley,* 92 Wis.2d 860, 286 N.W.2d 153 (Ct.App.1979); *see also People v. Superior Court of Kern County,* 6 Cal.3d 757, 100 Cal. Rptr. 281, 493 P.2d 1145 (1972); *State v. Davis,* 108 N.H. 45, 226 A.2d 873 (1967); *State v. Wolf,* 164 A.2d 865 (Del.1960); *People v. Duroncelay,* 48 Cal.2d 766, 312 P.2d 690 (1957); *State v. Kroening,* 274 Wis. 266, 79 N.W.2d 810 (1956); *State v. Towry,* 26 Conn. Supp. 35, 210 A.2d 455 (1965).