STATE OF MAINE
KENNEBEC, ss.

UNIFIED CRIMINAL COURT
AUGUSTA
DOCKET NO. CD-CR-16-796

STATE OF MAINE

v.

ORDER ON DEFENDANT'S
MOTION TO SUPPRESS

ROWE PALMER,
        Defendant

This matter came before the undersigned on September 23ʳᵈ, 2016 with respect to the Defendant's Motion to Suppress filed August 19, 2016. After hearing, and after the Court has had an opportunity to review the relevant case law and statutes, the Court makes the following Findings of Fact and Conclusions of Law upon which the **Order** set forth below is based:

## I. Findings of Fact:

1.    On Monday, January 4ᵗʰ, 2016 shortly after 4:00 p.m. deputy sheriff Toby Pond (hereinafter "officer") was dispatched to the scene of a multi-motor vehicle accident in the town of Chelsea, Maine. When the officer arrived at the scene he observed two vehicles, both trucks. One of the vehicles was lying on its roof and contained a male and a female. The occupants were removed from the truck by using the "Jaws of Life." Both people were injured.

2.    The Defendant was in the other truck. The windshield was pushed out. It appeared the Defendant was pinned inside his vehicle. Rescue personnel removed Defendant from the vehicle.

3.    The officer eventually learned the names of the other people: Richard Morin, who was life-flighted to Central Maine Medical Center, and Monique Morin, who was transported to Maine General Medical Center (hereinafter "MGMC"). Defendant was originally going to be taken to Eastern Maine Medical Center, but a decision was made to instead take him to MGMC. The officer described Defendant's injuries as "extensive."

4.    The area of the accident scene was in a 45 mph zone. The two vehicles apparently had collided with each other "head-on." The Defendant was taken to the hospital by ambulance 10-15 minutes after the officer arrived. The officer had no contact with the Defendant at the site.

5. The officer spoke to witnesses who witnessed the collision as well as to medical personnel. Thereafter the officer coordinated a "blood draw" from Defendant as well as Mr. Morin because the officer believed a "death was a possibility"[1] as a result of the accident. The officer drew a conclusion that Defendant's vehicle had crossed the centerline of the road. No emergency personnel at the scene told the officer that death of one or more of the occupants of the motor vehicles involved in the accident was going to occur as a result of the accident.

6. The officer later learned that the blood kit he had provided to other law enforcement for Defendant had expired. Blood was drawn from the Defendant in the ambulance at a time when apparently Defendant was unconscious.

7. On January 5, 2016 the officer spoke with Defendant while Defendant was hospitalized. Defendant gave the officer an oral statement[2]. The officer typed up a written statement based upon what the Defendant had told him, read the statement back to Defendant, allowed Defendant to read the statement twice, and then had Defendant sign the statement.

8. The officer also asked Defendant if Defendant would sign a medical release form. Defendant agreed to do so and in fact did sign on January 5, 2016.

9. Deputy sheriff Jacob Pierce (hereinafter "Pierce") was on routine patrol on January 4, 2016 at 6:30 p.m. when he was instructed to go to MGMC to obtain a sample of blood from the Defendant.

10. Pierce arrived at the Emergency Room of MGMC and observed the Defendant, Defendant's wife, and several medical personnel in a room. Pierce was told by emergency personnel that a blood draw from the Defendant had been done while Defendant was in the ambulance. Pierce saw the blood kit that had been used to obtain a sample of the Defendant's blood had expired. Pierce also was told that there had been no witness to the original blood draw from the Defendant other than the person who performed the blood draw.

11. Pierce left the hospital to obtain another blood kit. He then returned to the hospital where he encountered medical personnel who informed him that Defendant was about to go into surgery. Pierce explained that he needed another blood draw and why. Pierce went into the Defendant's room, and waited for medical personnel "to come down and execute the blood draw." Pierce overheard Defendant telling his family Defendant had consumed "a few beers with lunch." Eventually Pierce made his way over to the Defendant and told Defendant that Pierce needed another blood draw and why, specifically that the original kit had expired and that there were no witnesses to the blood draw.

---

[1] At one point during his testimony the officer acknowledged "not knowing if death was going to occur as a result of the crash or not…"

[2] Defendant was unable to provide a written statement due to injuries sustained in the accident.

2

Pierce told the Defendant that Pierce needed to witness the blood draw. Pierce did not recall asking the Defendant if he would be willing to submit to the blood draw.

12. Pierce testified that the Defendant "did not make any statements denying" the officer's request for a second blood draw. Defendant was concerned about the occupants of the other vehicle.

13. Pierce testified that Defendant could not sign the consent form that accompanied the blood draw kit because the Defendant was right-handed and Defendant's right hand had been broken in the accident.

14. Pierce testified that he did not seek a search warrant because he had been told the Defendant was about to go into surgery and that "they needed to expedite the process."

15. No one told Defendant he had a right to refuse the blood draw. No *Miranda* rights were read to Defendant.

16. Pierce did not know the extent of Defendant's injuries. Pierce did not notice any odor of intoxicants in his interaction with the Defendant, only the odor of blood. Defendant "had a bunch of dried blood on him" according to Pierce.

## II. *Conclusions of Law:*

17. Defendant seeks to exclude as evidence admissible against him the two samples of blood taken from him and the corresponding test results of same, the first sample being taken in the ambulance, the second sample at the hospital, on grounds that both samples were obtained without a warrant in violation of the Defendant's 4th Amendment rights and no exception to the warrant requirement appearing in this case. Counsel for Defendant cites *Birchfield v. North Dakota*, 195 L.Ed. 2d 560 (2016) and *Missouri v. McNeely*, 133 S. Ct. 1552 (2013) in support of his argument. In response, the State argues that the blood sample obtained in the ambulance was appropriate pursuant to 29-A M.R.S. § 2522, and that the Defendant consented to the sample obtained at the hospital. The State has cited no authority for its position. The undersigned will discuss the admissibility of each blood test below:

**(a) The blood draw in the ambulance**:

18. Title 29-A M.R.S. § 2522 reads in part "(I)f there is probable cause to believe that death has occurred or will occur as a result of an accident, an operator of a motor vehicle involved in the motor vehicle accident shall submit to a chemical test…to determine an alcohol level…"

19. The probable cause standard is flexible and based upon common sense. *State v. Bradley*, 658 A.2d 236 (Me. 1995). Although requiring more than mere suspicion, probable cause can be satisfied on less than the quantum of

3

proof necessary to establish a fact by a fair preponderance of the evidence. *State v. Cilley*, 1998 ME 34. And, it is the objective view of the circumstances that matters: the arresting officer's subjective belief regarding whether probable cause exists is not determinative. *State v. Forsyth*, 2002 ME 75.

20. Any results concerning the blood draw in the ambulance are **suppressed**. The test kit had expired. There was no evidence presented at this hearing that Defendant consented to the test, whether he was conscious or not, etc. There was no warrant. There were no witnesses to the blood draw. There was insufficient probable cause for the officer to believe death had occurred or would occur as a result of the accident; at best, the officer believed death could be "a possibility."

**(b) The blood draw at the hospital:**

21. Neither side cited *State v. Arndt*, 2016 ME 31. The undersigned finds *Arndt* applicable to the facts of this case. The Law Court in *Arndt* never reached the defendant's arguments concerning consent to a blood draw because the Law Court agreed with the trial court's conclusion that exigent circumstances were present to justify the blood draw absent a warrant to do so.

22. The Law Court in *Arndt* recognized that "(A)bsent consent, law enforcement officials are ordinarily required to secure a search warrant before taking a sample of a defendant's blood..." citing *Schmerber v. California*, 384 U.S. 757 (1966). The Law Court went on to note that "(G)enerally, searches conducted without a warrant are unreasonable unless the warrantless search is conducted within a limited number of well-recognized exceptions, such as consent by the defendant or exigent circumstances..." *Id.* at ¶ 6; *State v. Cormier*, 2007 ME 112.

23. The burden is on the State to prove by a preponderance of the evidence that exigent circumstances excusing the warrant requirement existed. The exigent circumstances justification for warrantless searches applies when there is a compelling need to conduct a search and insufficient time in which to secure a warrant. *Arndt, supra,* at ¶ 9; *State v. Rabon*, 2007 ME 113.

24. In this case the Court finds sufficient exigent circumstances present to justify the warrantless "search" of the Defendant by taking a sample of his blood while at the hospital..
Defendant had been involved in a serious motor vehicle accident involving serious injuries to three people. There was evidence that Defendant was responsible for the accident. Defendant stated that he had consumed alcohol earlier in the day. Defendant was about to go into surgery and the officer was told that the officer only had a few minutes because "Defendant needed surgery." The officer had no idea how long Defendant would be in surgery. Defendant did not object to the blood draw.

25. The exigent circumstances exception to the warrant requirement allows the admission of evidence obtained through a warrantless search if the

4

search is necessary to prevent the destruction of relevant evidence or some other consequence improperly frustrating legitimate law enforcement efforts. *State v. Cormier*, 2007 ME 112, ¶ 17. Based upon the above, the undersigned finds there was probable cause to believe Defendant was operating under the influence of intoxicants at the time of the accident such that it was reasonable to seek a sample of Defendant's blood for blood/alcohol analysis, and that exigent circumstances existed that justify the warrantless search.

26. Although it is a close question for the undersigned, the Court nevertheless declines to find that Defendant consented to either blood draw, as the Court finds that the State has failed to prove by a preponderance of the evidence that any "consent" was knowingly, intelligently, and voluntarily given. *State v. Bailey*, 2010 ME 15. Although failure to express an objection to the test can be evidence of actual consent, *Jacobs v. State*, 2016 Ga. App. LEXIS 539, based upon the evidence presented at hearing the undersigned finds the State has failed to establish by a preponderance of the evidence that Defendant knowingly, intelligently, and voluntarily gave his consent to the blood draw.

27. In summary, for the reasons stated above the Defendant's Motion To Suppress is **granted as to the blood draw taken in the ambulance and test results of same, and denied as to the blood draw taken at the hospital and test results of same.**

Date: 11/15/16

BY _Robert E. Mullen_

**Robert E. Mullen, Deputy Chief Justice**
**Maine Superior Court**