MLR/SC# 335-18

10/16/18
Need Atty
info
Darrick Banda
DA Maeghan Maloney

STATE OF MAINE
KENNEBEC, SS.

UNIFIED CRIMINAL COURT
AUGUSTA
DOCKET NO. CR-2017-1224

STATE OF MAINE

V.

TYLER GOUCHER

**ORDER ON PENDING MOTIONS**

**INTRODUCTION**

Before the Court are the following motions filed by the Defendant on August 1, 2018: (1) Motion to Suppress (Fruits of Search Warrants); (2) Motion to Suppress (Consent Issue); (3) Motion in Limine to Exclude Medical Records & Blood Sample Obtained from Hospital and; (4) Motion in Limine to Exclude HETL (Health and Environmental Testing Laboratory) Alcohol Testing Results & Testimony of Stephen J. Pierce. An evidentiary hearing on the motions was held on September 26, 2018 at which the Court received the testimony of the following witnesses called by the State: Joseph Dobbins; Julie Beaupre; Amanda Murphy; Stephen Pierce; Michele Vining; Deputy Sheriff Adam Bacon, and; Sgt. Frank Hatch. The Court also received the testimony of John Godfrey called by the Defendant. State's Exhibits 1-6 were admitted into evidence. Defendant's Exhibits 2 & 3 were also admitted.[1] Jury selection in this case is scheduled for November 8 and 9, 2018, with trial set to begin on November 26, 2018.

---

[1] Defendant's Exhibit 1, DHHS Rules for the Collection of Samples and Testifying in Suspected OUI Cases, was marked and used at the hearing but was not offered or admitted into evidence. The Rules appear as an attachment to the Defendant's Motion in Limine to exclude the blood sample results from the hospital, namely, Central Maine Medical Center.

bourgetpa@gwi.net
contact@kennebecda.com

Based upon the evidence presented at the hearing, and after considering the arguments of the parties, the Court makes the following findings of fact.

## FINDINGS OF FACT

Late in the evening of May 12, 2017, a motor vehicle crash occurred in Mount Vernon. The Defendant, Tyler Goucher, was the operator of the vehicle that was involved in the crash. Two passengers were in his vehicle at the time. One of the passengers, Ethan Russell, was seriously injured and law enforcement personnel quickly learned that the crash could potentially involve a fatality.

Kennebec County Deputy Sheriff Adam Bacon was one of the law enforcement officers who responded to the crash scene. He later responded to the Central Maine Medical Center (CMMC) in Lewiston to collect clothing from the Defendant and obtain his consent to take photographs of his injuries. The Defendant was cooperative and gave his consent by scribbling his signature on the consent form.[2] *See* State's Exhibit 4.

By the time Deputy Bacon arrived at the crash scene, ambulance personnel and other law enforcement officers were already there. Michele Vining, an advanced EMT with Winthrop Ambulance, was with the first ambulance to arrive and she was assigned to attend to the Defendant. The Defendant was alert, talking, breathing, and very concerned about his friends and wanted to know if they were "okay." Once the Defendant was "cleared" for his spinal evaluation he was able to walk to the ambulance on his own power.

While Ms. Vining was assessing and evaluating the Defendant, Sgt. Frank Hatch of the Kennebec County Sheriff's Department was also there for at least part of the time. Sgt. Hatch had activated his digital recorder for some period of the time

---

[2] The Defendant was hooked up to IV lines when he was asked to sign the consent form.

2

while he was in the Defendant's presence. That recording was admitted into evidence as State's Exhibit 6. It has a total recoding time of 28:27. The court has listened to the recording twice in its entirety and certain portions of it multiple times.

The Defendant was cooperative, very talkative and told Sgt. Hatch that he was the driver of the vehicle, that he was "ok" to drive, that he and his friends had been at the Weathervane Restaurant, that he had three (3) drinks including two beers and one "Grateful Dead," that he was going 50-55 mph, and that just prior to the crash he felt his truck "kick," for which he "corrected." Later in the recording he volunteered to Sgt. Hatch that had "hit the brakes hard," and the truck "slid out of control" when the brakes locked up.

The Defendant was very concerned about the welfare of his two friends and he firmly, loudly and repeatedly pressed both Ms. Vining and Sgt. Hatch for information about their condition. He specifically asked how the one in the ditch (Richard Hall) and the one in the road (Ethan Russell) were doing. Both Ms. Vining and Sgt. Hatch declined to give the Defendant much information about his friends' well-being, claiming that they did not know any information because they were focusing their attention and efforts on the Defendant.[3]

At about 7:03 of the recording, Sgt. Hatch asked Ms. Vining: "If I get a blood kit, can you pull that?" Ms. Vining initially responded by asking something to the effect if the kit specified the order of the blood draws because she was not "familiar with drawing blood for stuff like that." At the hearing, she clarified that she had not

---

[3] Based on its review of the recording, it became obvious to the Court that Sgt. Hatch knew at some point while at the crash scene, that Ethan Russell (the one in the road) had died. At the end of the recording, after the ambulance carrying the Defendant had departed the scene, Sgt. Hatch and other law enforcement officers still there can be heard discussing the fact that Mr. Russell was deceased and that the Medical Examiner's Office had been notified. It was also obvious from the recording that the Defendant was suspicious that Sgt. Hatch was not telling him everything he knew about his friends and the severity of their injuries. During his testimony at the hearing, Sgt. Hatch confirmed that he knew that someone at the scene had died.

used a HETL blood kit prior to doing so on May 13, 2017. She agreed to do the blood draw as requested by Sgt. Hatch.

At 8:08 of the recording, Sgt. Hatch can be heard telling other law enforcement officers at the scene: "I need a blood kit." At 9:27 of the recording, Sgt. Hatch and another officer can be heard talking about the expiration date on the kit and confirming that it was still valid until 2018. At approximately 11:00 of the recording, Sgt. Hatch and Ms. Vining can be heard discussing/examining the contents of the kit. At 11:35, Sgt. Hatch said: "Tyler, she's gonna – I'm going to ask her to draw up some blood out of you, okay? Do you have any issues with that?" The Defendant immediately replied: "No."

Over the next several minutes, Ms. Vining and Sgt. Hatch reviewed the directions contained within the blood kit. Ms. Vining drew the required number of samples, labelled them, signed the forms presented to her by Sgt. Hatch and gave the samples to Hatch for re-packaging and sealing. Sgt. Hatch temporarily stored the kit in his locked cruiser. Later, he took the sealed kit to the HETL drop box at the Augusta Police Department. The Defendant was not asked to sign any consent form.

The blood sample taken from the Defendant by Ms. Vining inside the ambulance on May 12, 2017 was received at HETL on May 15, 2017 from the drop box. *See* State's Exhibit 2. Sgt. Hatch believed that the Defendant had consented to the taking of his blood at the scene. On May 17, 2017, however, counsel for the Defendant sent a letter to Stephen Pierce at HETL (via fax and US Mail) stating that the Defendant "now hereby withdraws consent to any further examination and/or testing of his blood." *See* Letter attached to Search Warrant Affidavit in Docket # SW-17-0053.

The letter prompted the submission of an application for a search warrant authorizing the examination/testing of the blood sample by HETL. The request was

supported by the Affidavit of Sgt. Scott Mills, II, of the Kennebec County Sheriff's Office. He asserted in the affidavit that he was one of the deputies who had responded to the scene of a crash on the North Road in Mount Vernon on May 12, 2017 involving a 2008 Chevy Silverado pick-up truck being operated by the Defendant.

The affidavit further alleged that Ethan Russell was dead at the scene and Richard Hall was "severely injured." Sgt. Mills described the crash scene as involving approximately 300 feet of skid marks showing the truck leaving the road in the opposite lane of travel, rolling over, striking a tree and coming to rest against a telephone pole. The damage to the truck was described as "catastrophic," with the rear axle and the pick-up bed having been separated from the rest of the truck. Debris from the crash was strewn over a considerable area. All three occupants of the truck were ejected. Based on the scene it appeared that speed was a fact in the crash.

An 18-pack of Bud Light beer was found under the truck. The affidavit contained some of the information obtained by Sgt. Hatch from the Defendant on the night of the crash, including: that he was the driver of the vehicle; that he and his two friends had been drinking alcohol at the Weathervane prior to the crash; that the Defendant was the "most sober, so he drove;" that he was speeding trying to catch up with his other friends who had left earlier in another vehicle. Sgt. Mills opined that operating under the influence "appear[ed]" to be factor in the crash.

The affidavit recounted that a blood sample had been drawn from the Defendant at the crash scene under the belief that he had consented to the blood draw, but that his attorney's letter had subsequently been sent to HETL, "professing to withdrawn consent for testing."

Finally, the affidavit averred that the Defendant had been taken to CMMC in Lewiston where both blood and urine samples had been obtained from him. The

5

affidavit recited that an earlier warrant had authorized the State to seize those blood and urine samples from CMMC for testing by HETL.

The warrant was issued on May 17, 2017. (SW-2017-0053) (E. Walker, J.). The blood sample was tested at HETL and a report (certificate) was issued showing a BAC of 0.217%. *See* State's Exhibit 2. The HETL report for this sample documents a collection time of the sample of 23:01 (11:01 p.m.) on May 12, 2017. *Id.*

As noted earlier, the Defendant was transported by ambulance to CMMC in Lewiston. Phlebotomist Joseph Dobbins had no independent recollection of names or particular dates, but he did recall the night of this "trauma" incident, and he did recall drawing blood in connection with this matter. He also recalled that he was told to "hold" any samples pending the issuance of a search warrant.

Mr. Dobbins testified that it was important for him, and other phlebotomists, to follow specific protocols with respect to the drawing of blood samples in order to prevent cross-contamination and because medical staff depend upon the accuracy and reliability of results for medical treatment purposes. The patient's wrist-band is bar-coded. All labels associated with that patient are also bar-coded and the labels must match the patient's wrist-band. The records created and maintained by the hospital contain information as to who performed the blood draw, who sent the samples to the laboratory and who at the laboratory received the samples. This is all done by means of the bar-code scanning system utilized by CMMC.

Mr. Dobbins testified that in any trauma case he would always use an iodine, not an alcohol, swab to "prep" the site of the blood draw. He was not familiar with the blood evidence collection kit issued by HETL, as he had never used one, and he was not familiar with the rules promulgated by HETL/DHHS regarding forensic testing of a blood sample. Once Mr. Dobbins, or any of the phlebotomists at CMMC, completes a blood draw on a patient and has properly labeled and scanned it, it is

6

sent to the laboratory by means of a pneumatic tube. The phlebotomist has no involvement in the laboratory testing process.

Julie Beaupre is the clinical supervisor at the CMMC laboratory and has held that position for four years. Her duties include the overall supervision of the chemistry laboratory, insuring that the laboratory records are up-to-date, and maintaining the laboratory's accreditation by the American College of Pathologists. The laboratory is inspected every two years in order to maintain its accreditation.

The CMMC laboratory is equipped with two Ortho 5600 Clinical Diagnostic Analyzers that provide results of chemical analysis on samples submitted to the laboratory as ordered by a physician. The machines are subject to quality controls on a daily basis. The equipment is nationally recognized as being reliable in the hospital setting. The machine will generate a "problem log" if any error in the testing has been detected, and if a problem has been identified the results will not be used. Ms. Beaupre testified that she reviews the maintenance logs for the month as well as for each shift and she did so for May 13, 2017.

She was able to locate and review laboratory records pertaining to the Defendant for that date. She testified that everything about the equipment and the test results were "acceptable." Based upon her examination of hospital/laboratory records, she was able to determine that Joseph Dobbins was the phlebotomist who drew the Defendant's blood sample at CMMC on May 13, 2017. She further testified that the bar-coding system employed at CMMC will "tag" the person who input the data (e.g., who took the sample; who received it at the lab) as well as the physician who ordered the test.

Ms. Beaupre personally has used the Ortho Diagnostic Analyzer. She explained that the equipment will perform general chemical analysis for blood alcohol content. When a blood sample is received at the laboratory, one of the technicians will scan it, "spin" it down and load the sample onto racks, at which

point the Ortho Analyzer "reads it automatically." The analysis is performed on blood serum or plasma after it has been "spun" or separated in a centrifuge, and not on whole blood. If an error occurs during the analysis, the "auto-verifier" flags the error. The process would then stop and the results of the testing would not be released to the patient's chart (record). If no error is identified during the testing process, the result of the analysis is automatically released to the patient's medical record and is available for review by the patient's treating physician.

Ms. Beaupre was not familiar with the standards for forensic testing of blood samples as adopted by HETL. She testified that the Ortho Diagnostic Analyzer was used for medical and hospital purposes, not for forensic purposes. She acknowledged that CMMC does not use Dual Column Gas Chromatography to analyze blood samples. Based on her review of the hospital/laboratory records, created and maintained in the regular course of the business of CMMC, she testified that the report of the analysis of the blood sample taken from the Defendant at the hospital on May 13, 2017 showed an ethanol level of 228 mg/dl (milligrams/deciliter). *See* State's Exhibit 1.

Amanda Murphy (f/k/a Amanda Webb) was employed as a medical laboratory technician at CMMC until the end of May 2017. She worked the third shift from 8:30 p.m. to 7:00 a.m. She explained the procedure used at CMMC while she worked there for the laboratory analysis of patient samples. Briefly described, that process starts when an authorized treatment provider has ordered tests. That order would be entered into the computer system using a bar-code scanning process. Once the sample was received at the laboratory, it would be scanned in there, "spun" down and then placed on the analyzer. The machine runs the sample using the pre-programed bar code scan to identify which tests are to be performed.

She also described the auto-verifier software that will flag an error and will not release the test results to the patient's chart if an error is detected. On the other

8

hand, the auto-verifier will automatically release the test results to the patient's record if no error is identified.

Ms. Murphy did not have an independent memory of receiving the Defendant's blood sample on May 13, 2017, but based on information supplied to her by management personnel at the CMMC laboratory, she was able to determine that she was the technician who received the sample and "ran" the test results.

As with the other witnesses from CMMC, Ms. Murphy was not familiar with HETL testing standards or rules. She confirmed that the hospital laboratory conducts its testing on blood plasma and not whole blood, and that such testing is for medical, not forensic purposes.

On May 16, 2017, Sgt. Mills applied for a search warrant for the seizure of the blood and urine samples obtained from the Defendant at CMMC, and copies of the laboratory test results of the hospital's analysis of those samples. The affidavit in support of that warrant contained the same substantive information that has already been described with respect to the affidavit to test the Defendant's blood sample taken at the crash scene. The warrant was issued on May 16, 2017. (SW-2017-0052) (Stokes, J.)[4]

The warrant was executed on the same day it was issued and the blood sample was received by HETL on May 17, 2017. The blood sample was analyzed and a report (certificate) was issued showing a BAC of 0.202%. *See* State's Exhibit 3. The HETL report documents a collection time for this sample of 00:12 (12:12 a.m.) on May 13, 2017. The laboratory report from CMMC, however, documents a collection time of 00:16 (12:16 a.m.) on May 13, 2017. *See* State's Exhibit 1.

---

[4] At the hearing held on September 26, 2018, the undersigned justice disclosed on the record that he had issued this warrant dated May 16, 2017. Counsel for the Defendant stated on the record that the defense did not object to this justice hearing and deciding the motion to suppress any evidence and fruits thereof obtained as a result of this warrant.

Stephen Pierce was a chemist at HETL for 24 years and retired from that position in 2017. While employed there he was certified every six months to conduct blood alcohol testing. He received the sample of the Defendant's blood taken at the crash scene by Michele Vining and the blood sample taken at CMMC and tested both samples on the same day, i.e. May 22, 2017. Certificates of alcohol analysis were issued on May 23, 2017. *See* State's Exhibits 2 & 3.

Mr. Pierce testified that HETL uses a head space gas chromatograph to test for blood alcohol content, which is recognized as an accurate and reliable method. The test is performed on whole blood. The samples were tested in a "batch" with two portions drawn out and put in sealed head space vials for testing by the head space auto analyzer. There were standards and controls that were used to cross-check that the equipment was operating properly. Pierce had read the affidavit of Mr. Godfrey, the defense expect, and denied that the whole blood controls used in the testing involved in this case were 14% "off the mean" as suggested by Mr. Godfrey.

The results from the head space gas chromatograph were entered by hand by Mr. Pierce on a worksheet and then referred to another chemist for review. The supervisor of the laboratory reviewed the test results before sending them back to Mr. Pierce for the issuance and certification of the report.

Mr. Pierce was not familiar with the Ortho Diagnostic Analyzer used at CMMC, although he "expected" that the results of the procedure used at the hospital would be accurate. He was able to perform a conversion of the results obtained at CMMC on the Defendant's blood (serum or plasma). Using a conservative conversion rate or factor, Mr. Pierce testified that the 228mg/dl was the equivalent of a 0.186% BAC. Using a somewhat less conservative conversion factor, the result from CMMC was the equivalent of a 0.196% BAC.

10

John Godfrey is a retired analytical chemist and high school science teacher who was called by the Defendant. He reviewed the laboratory work of Mr. Pierce and opined that there were inconsistencies and procedural flaws that called into question the validity and reliability of the blood alcohol testing by HETL as represented in State's Exhibits 2 and 3. Specifically, Mr. Godfrey was of the opinion that Mr. Pierce departed from HETL standard operating procedures and protocols by not running the whole blood control (standard) in duplicate. Moreover, Mr. Godfrey testified that the whole blood control used by Mr. Pierce represented a 14% deviation from the manufacturer's expected result, which he found unacceptable. Mr. Godfrey also expressed concern with the potential for "carry-over" from other samples, thereby giving a test result higher that it should be. Mr. Godfrey also made reference to what he described as a "side-shoulder" on the graph for Column B (sometimes referred to as Column 2), which he suspected was causing Column B to be artificially higher than it should be. In Mr. Godfrey's view, the combination of these irregularities rendered the HETL results invalid.

With respect to the test results from CMMC using the Ortho Diagnostic Analyzer, Mr. Godfrey testified that there were no published rates of uncertainty for these types of tests. The test results on serum cannot be compared to a result from whole blood using gas chromatography. Godfrey suggested that the conversion factor itself has uncertainty in it, which he suspects was as much as 25%.

Stephen Pierce was recalled by the State to rebut Mr. Godfrey's criticisms. In particular, Pierce testified that Godfrey had misinterpreted the HETL rules and protocols. Pierce testified that he had, in fact, run the samples twice, and the standards (whole blood controls) once in both Columns A and B to obtain two (2) results, thereby following the HETL standard operating procedure.

With respect to the "side-shoulder" observed by Mr. Godfrey, Pierce pointed out that the peaks for each column are different, namely, Column A has sharper peaks while Column B has broader peaks.

Finally, Mr. Pierce addressed the issue of carry-over by noting that it can be an issue at "very high" concentrations (e.g. 0.3% or higher). But in this case it was simply not an issue.

## DISCUSSION

### I. Motion to Suppress (Fruits of Search Warrants)

The Defendant has moved to suppress the fruits of the two search warrants that: (1) authorized the testing of the blood sample drawn at the crash scene by Ms. Vining, and; (2) authorized the seizure and testing of the blood sample taken at CMMC as well as the results of the analysis of his blood done at the hospital.[5] (*See* SW-2017-0052 & 0053). The Defendant contends that the affidavits in support of these search warrants were insufficient to establish probable cause to believe that he was under the influence at the time of the crash. Specifically, the Defendant argues that because the affiant noted that speed was a factor in the crash and failed to note any outward signs of intoxication, such as slurred speech or the odor of alcohol, the affidavit lacked the necessary facts to support a finding of probable cause.

A court reviewing a magistrate's determination of probable cause does not, and should not, make a *de novo* determination. Rather, deference must be accorded to the magistrate's finding of probable cause. *State v. Coffin,* 2003 ME 83, ¶ 4, 828 A.2d 208. The court's inquiry is limited to whether there is a "substantial basis" for the finding of probable cause. *State v. Johndro,* 2013 ME 106, ¶ 9, 82 A.3d 820.

---

[5] There were actually three search warrants issued in connection with this case. In addition to the two that are the subject of the motion to suppress, another warrant authorized the search of the Defendant's 2008 Chevy Silverado pick-up truck that was involve in the crash. The Defendant has not challenged that warrant. (SW-2017-0049).

The affidavit must be given a "positive" not a "grudging" reading and it must be reviewed "with all reasonable inferences that may be drawn to support the magistrate's determination." *See State v. Crowley,* 1998 ME 187, ¶ 3, 714 A.2d 834; *State v. Higgins,* 2002 ME 77, ¶ 20, 796 A. 2d 50. The test for probable cause is limited to the "four corners" of the affidavit. *State v. Thornton,* 414 A.2d 229, 233 (Me. 1980).

The "substantial basis" test calls upon the magistrate to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Johndro,* 2013 ME 106, ¶ 10 (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). The affidavit is to be reviewed in a "common sense and realistic fashion....Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *State v. Lutz,* 553 A.2d 657, 659 (Me. 1989) (quoting *United States v. Ventresca,* 380 U.S. 102, 109 (1965)).

In *State v. Palmer,* 2018 ME 108, ¶ 10, 190 A.3d 1009, the Law Court stated that in the context of an OUI investigation, "[i]nformation that contributes to a finding of probable cause includes the suspect's responsibility for a motor vehicle collision and 'an admission by the driver that he had consumed alcohol.'" *Quoting Turner v. Sec'y of State,* 2011 ME 22, ¶ 11, 12 A.3d 1188. Here, the two affidavits (which were virtually identical) provided facts that: (1) a motor vehicle crash involving a single vehicle had occurred in which one person had died and another was severely injured; (2) the vehicle was owned and operated by the Defendant; (3) the vehicle had been traveling at a high rate of speed at the time of the crash; (4) an 18-pack of beer had been found under the vehicle at the crash scene; (5) the Defendant admitted drinking prior to the crash but felt "he was the most sober, so he

13

drove," and; (6) the Defendant was deliberately speeding in order to catch up with other friends who had left in another vehicle. These facts in combination were sufficient to support a finding of probable cause and the issuance of the two search warrants. The Defendant's Motion to Suppress (Fruits of Search Warrants) is denied.

## II. Motion to Suppress (Consent Issue)

The Defendant correctly points out that his blood was drawn by Ms. Vining at the request of Sgt. Hatch without a search warrant. "A search is reasonable for constitutional purposes only if it is authorized by a warrant or if an exception to the warrant requirement is present." *Palmer*, 2018 ME 108, ¶ 9. Here, the claimed exception is the consent of the Defendant. The Defendant, for his part, argues that the State cannot show a freely and voluntarily given consent, but only mere acquiescence to Sgt. Hatch's directive that he was going to have Ms. Vining draw a sample of his blood.

Consent is a recognized exception to the warrant requirement, if it is freely and voluntarily given. It is the State's burden, by a preponderance of the evidence, to show "that an objective manifestation of consent was given by word or gesture." *State v. Boyd,* 2017 ME 36, ¶ 10, 156 A.3d 748 *quoting State v. Bailey,* 2012 ME 55, ¶ 16, 41 A.3d 535. In meeting this burden, the State must show "more than mere 'acquiescence to a claim of lawful authority.'" *State v. Cress,* 576 A.2d 1366, 1367 (Me. 1990) *citing and quoting Bumper v. North Carolina,* 391 U.S. 543, 549 (1968). Whether consent has been voluntarily given is "determined from the totality of all the circumstances." *State v. LeMeunier-Fitzgerald,* 2018 ME 85, ¶22, 188 A.3d 183 *quoting Birchfield v. North Dakota,* 579 U.S. ____, 136 S. Ct. 2160, 2186 (2016).

Based on the totality of the circumstances, the court finds by a preponderance of the evidence that the Defendant freely and voluntarily consented to the taking of his blood while in the ambulance at the crash scene. The audio recording of the

14

interaction between the Defendant and Sgt. Hatch clearly shows the Defendant as the dominant person in the conversation. He was talkative, cooperative and assertive. On several occasions he demanded to know how his friends were doing and he even challenged Sgt. Hatch when he suspected that the officer was not being completely forthcoming with him. At no point did Sgt. Hatch threaten him, either expressly or implicitly, nor did he use any trickery or make any misrepresentations to the Defendant. Sgt. Hatch did not assert any claim of authority to take the Defendant's blood and did not suggest to the Defendant that he was under a legal obligation to permit a blood draw. Rather, Sgt. Hatch's primary concern, at least as expressed on the audio recording, was the Defendant personal welfare.

It is also clear from the recording that Sgt. Hatch was subjectively planning to have a blood sample taken from the Defendant. He asked Ms. Vining if she was willing to do the draw if he located a blood kit. He then went in search of a kit from another law enforcement officer. While the Defendant was in the ambulance, presumably lying on a stretcher, Sgt. Hatch stated: "Tyler, she's gonna – I'm going to ask her to draw up some blood out of you, okay? Do you have any issues with that?" The Defendant immediately said "no."

Viewed in the context of the interaction between Sgt. Hatch and the Defendant, the court is satisfied that the Defendant objectively manifested his consent to the taking of his blood by telling Sgt. Hatch that he had no "issues" with the taking of his blood.

Alternatively, the court finds that the warrantless blood draw from the Defendant was authorized by 29-A M.R.S. §2522. Subsection 1 of that statute provides:

> If there is probable cause to believe that death has occurred or will occur as a result of an accident, an operator of a motor vehicle involved in the motor vehicle accident shall submit to a chemical test, as defined in

15

section 2401, subsection 3, to determine an alcohol level or the presence of a drug or drug metabolite in the same manner as for OUI.

The statute directs that "[t]he investigating law enforcement officer shall cause a blood test to be administered to the operator of the motor vehicle as soon as practicable following the accident . . . ."[6] 29-A M.R.S. §2522(2). Regarding the admissibility of any test results, subsection 3 specifies:

> The result of a test is admissible at trial if the court, after reviewing all the evidence, whether gathered prior to, during or after the test, is satisfied that probable cause exists, independent of the test result, to believe that the operator was under the influence of intoxicants at the time of the accident.

29-A M.R.S. §2522(3).

Thus, unlike a "routine" OUI stop or investigation, section 2522 does not require that there be probable cause to believe an operator of a motor vehicle involved in a fatal or likely fatal accident was under the influence of intoxicants in order for the operator to submit to a chemical test. On the contrary, section 2522 mandates the administration of a blood test to the operator "[i]f there is probable cause to believe that death has occurred or will occur," as a result of the accident. The requirement that there be probable cause to believe the operator "was under the influence of intoxicants at the time of the accident," must be shown by evidence, independent of the test, but only at the time of trial as a precondition to admissibility. In this case, of course, the court has already found that probable cause existed at the scene to believe the Defendant was operating under the influence at the time of the crash.

---

[6] The officer is also authorized to cause a breath test or other chemical test to be administered if the officer determines it to be "appropriate." The operator is required to "submit to and complete all tests administered." 29-A M.R.S. §2522(2).

16

In short, in enacting a law requiring a blood test (or other chemical test) in fatal and likely fatal motor vehicle accidents, "the Legislature did not intend to treat an operator involved in a motor vehicle fatality in the same fashion as an operator involved in a routine OUI stop." *State v. Bento*, 600 A.2d 1094, 1096 (Me. 1992) (interpreting but declining to address the constitutionality of 29 M.R.S. §1312, the predecessor statute to 29-A M.R.S. §2522).

In *State v. Roche*, 681 A.2d 472 (Me. 1996) the Law Court directly considered the constitutionality of 29 M.R.S. §1312. The law was challenged on the basis that "it mandates testing without probable cause to believe the vehicle operator has been driving while impaired."[7] *Id.* Relying on *Skinner v. Railway Labor Executives Ass'n.*, 489 U.S. 602 (1989), which upheld regulations requiring blood tests of railroad employees after certain major train accidents under a "special needs" exception to the probable cause requirement, the Law Court held that

> . . . the statute [29 M.R.S. §1312] contemplates that probable cause is implicated only when admission of the test result is sought *at the trial*. The justification for the search is linked to the gravity of the accident as well as the evanescent nature of evidence of intoxication and the deterrent effect on drunk driving of immediate investigations of fatal accidents. The State, in effect, conditions the privilege of driving on every driver's willingness to submit to a test, if, and only if, he or she is involved in a fatal or near fatal car accident. In all other OUI scenarios the State may proceed to search an individual only on the basis of probable cause. We believe *Skinner* confirms the permissibility of such a scheme.

681 A.2d at 474 (emphasis in original).

---

[7] In *Roche* the defendant conceded that "exigent circumstances exist in virtually every blood-alcohol testing situation . . . ." 681 A.2d at 473. Recent United States Supreme Court precedent would seem to undermine the correctness of that concession from a legal standpoint. *See Missouri v. McNeely*, 569 U.S. 141, 133 S.Ct. 1551 (2013), which will be discussed *infra*.

In the Law Court's view, *Skinner* sanctioned the Legislature's purpose of addressing the grave danger of vehicular fatalities by regulating the act of driving by requiring that any operators of motor vehicles involved in a fatal or near fatal accident submit to a blood test. In other words, "[d]riving is an activity that is increasingly subject to regulation, and one involved in a fatal accident would ordinarily expect to be subjected to an investigation." *Id.*

Then in 2007 the Law Court in *State v. Cormier*, 2007 ME 112, 928 A.2d 753 was called upon to decide the constitutional validity of 29-A M.R.S. §2522, the statute presently in effect. *Cormier* involved a double fatality. Law enforcement did not have probable cause to believe that the defendant was under the influence at the time of the fatal accident. Nevertheless, acting in accordance with 29-A M.R.S. §2522(1), a detective arranged to have blood drawn from the defendant at the hospital. The defendant's consent was not obtained. The superior court granted the defendant's motion to suppress and the State appealed. The Law Court, with two justices dissenting (Levy and Calkins, JJ.) reversed.

As an initial matter, the Court recognized the unique nature of Maine's statute. First, it pointed out that mandatory testing in fatal and likely fatal accidents is required "without regard to the possibility that the driver may be prosecuted." 2007 ME 112, ¶ 8. Second, the Court noted that the statute allows a determination of probable cause, independent of the test, "gathered *after* the test had been taken." *Id.* at ¶ 10.

The Court began its analysis of the constitutionality of section 2522 by restating the general principle that the Fourth Amendment protects "against unreasonable searches and seizures." *Id.* at ¶ 14. It also observed that the absence of a warrant or consent does not necessarily "dispose of the question of the reasonableness of a search," since there are several well-known exceptions to the warrant requirement. *Id.* at ¶ 15.

The Law Court majority viewed the type of search authorized by section 2522 as a "narrow and distinct" blending of the "inevitable discovery" and "exigent circumstances" exceptions. The Court described it in the following terms:

> Through the enactment of section 2522(3), which allows the probable cause determination required for admissibility to be based on evidence gathered before, during, *or after* the test, the Legislature has recognized that exigent circumstances are present at a fatal collision site and has codified a narrow and distinct application of the inevitable discovery exception that applies in the absence of probable cause established before the administration of the test . . . . The statute codifies this narrow application of the inevitable discovery doctrine by requiring officers to collect drug and blood-alcohol content evidence at the scene, but prohibiting the admission of that evidence absent a factual demonstration that, had the exigencies of the fatal collision scene not existed, probable cause to administer the test would have been determined to exist.

*Id*. at ¶ 19 (italics in original)(citations omitted).

The Law Court emphasized that in enacting the statute in the late 1980's (first 29 M.R.S. §1312 then 29-A M.R.S. §2522), the Legislature was aware of and considered "the urgent life-and-death nature of an accident scene." *Id*. at ¶ 21. In particular, the Court described the "obvious exigencies" that existed at a fatal or likely fatal motor vehicle crash site.

> When a serious collision, likely to involve a fatality, has just occurred, responding officers are, and should be, occupied with potentially life-saving matters that are more urgent than gathering evidence of intoxication to support the probable cause necessary for a blood test. The officers may also be responsible for assuring that the collision scene does not create greater dangers to other motorists who must travel the same road. The Legislature, in attempting to identify drivers involved in deadly accidents while intoxicated, has also taken into account the chaos inherent at the scene of a fatal, or likely fatal accident. The statute requires immediate testing, in these narrow circumstances, without the ordinary pause to collect evidence relevant to whether alcohol or drugs might have impaired the driver.

*Id.* at ¶ 20.

Ultimately, the Law Court held that in the narrow and grave situation where a fatal or likely fatal accident has occurred, and with the protections built into the statute that allow for admission of the test in limited circumstances, 29-A M.R.S. §2522 did not offend the Fourth Amendment. Specifically, the Court held that "[s]ection 2522(3) allows the admission of the test results, in the absence of consent, a warrant, or the existence of probable cause in advance of the test, only if: (1) the State presents evidence gathered after the fact demonstrating that, but for the exigencies at the scene of the collision, probable cause for the test would have been discovered; and (2) the test would have been administered based on the probable cause established by this independent lawfully obtained information." *Cormier*, 2007 ME 112, ¶ 26.

On this basis alone, the Court said, it could have ended its analysis. Nevertheless, the Court went further and considered the "special needs" exception. That exception focuses on balancing the privacy interests involved against the governmental interests at stake "to assess the practicality of the warrant and probable cause requirements." 2007 ME 112, ¶ 29. In engaging in this analysis, the Court considered *Skinner v. Railway Labor Executives Ass'n.*, 489 U.S. 602 (1989) and *Ferguson v. City of Charleston,* 532 U.S. 67 (2001).

The Law Court concluded that Maine's statute was enacted not for the "sole" or "primary" purpose of law enforcement, "but rather a joint concern with that of gathering information for policy development." 2007 ME 112, ¶ 35. In the Court's view, section 2522 is more like the regulations upheld in *Skinner* and unlike the hospital policy struck down in *Ferguson* which had, according to the Law Court, an "immediate objective" of generating "evidence for law enforcement purposes to coerce pregnant women into obtaining substance abuse treatment." *Id.*

When it came to balancing the privacy interests of drivers involved in fatal accidents against the State's "compelling need" to obtain information about fatal collisions and intoxicated drivers, the Court concluded that the State's interest outweighed the privacy interests involved. "The State's special needs, separate from the general purpose of law enforcement, justify an exception to the warrant requirement in these circumstances." *Id*. at ¶ 36.

Thus, on May 12, 2017, when the Defendant was involved in a fatal crash in Mount Vernon while operating his Chevy Silverado, Maine had in effect a statute that directed the investigating law enforcement officer to "cause a blood test to be administered" to the Defendant "as soon as practicable." That statute, and its predecessor statute, were challenged as unconstitutional in 2007 and 1996 respectively. On both occasions, the Maine Law Court rejected those constitutional challenges and explicitly held that the statutes did not violate the Fourth Amendment.

Notwithstanding the foregoing, there have been significant changes in Fourth Amendment jurisprudence in the area of warrantless blood tests of motorists, as articulated by the Supreme Court since the Law Court's decision in *Cormier*. Two cases, one decided in 2013 and the other in 2016, have caused courts and litigants to question previously long-accepted views of what is permissible in the context of OUI related investigations. Those decisions, of course, are *Missouri v. McNeely*, 569 U.S. 141, 133 S.Ct. 1552 (2013) and *Birchfield v. North Dakota*, 579 U.S.____, 136 S.Ct. 2160 (2016). The Defendant maintains that these decisions, individually and in combination, have rendered 29-A M.R.S. §2522 unconstitutional.

In *Missouri v. McNeely*, the Court addressed the specific question "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." 133 S. Ct. at 1556. The

21

actual holding of *McNeely* is "that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *Id.* at 1568. Rather, whether exigent circumstances exist justifying action by law enforcement without a warrant is to be determined by looking at the "totality of the circumstances" with each case of "alleged exigency based 'on its own facts and circumstances.'" *Id.* at 1559 *quoting Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931).

*Missouri v. McNeely* involved what was described as a "routine DWI case," with no special facts supporting a finding of exigency, other than the natural dissipation of alcohol in the bloodstream. The Supreme Court recognized that other factors, such as the need to investigate an accident (or even the dissipation of alcohol in the body), may justify a warrantless blood test. *Id.* In short, *Missouri v. McNeely* rejected a *per se* rule that a warrantless blood test is always permissible for the sole reason that alcohol naturally dissipates over time in the body.

The Defendant argues that *Missouri v. McNeely* has rendered 29-A M.R.S. §2522 unconstitutional. The court is not completely convinced of that, although this court has noted that *Missouri v. McNeely* "may have significantly undermined the Law Court's decision in *Cormier*." *See State v. Dennison*, Wash. Cty. Sup. Ct. Docket No. CR-2015-25 (January 19, 2016). Upon closer examination of *Missouri v, McNeely* the court is less sure that the Supreme Court would reject a narrowly tailored statute such as 29-A M.R.S. §2522 that is designed to deal with actual emergencies involving vehicular death scenes.

The Supreme Court acknowledged those states with laws allowing police to obtain a blood sample without consent in "cases involving accidents resulting in death or serious bodily injury. 133 S.Ct at 1566. Moreover, in support of its ultimate holding, the *McNeely* Court relied heavily on the seminal case of *Schmerber v.*

22

*California*, 384 U.S. 757 (1966) and emphasized that, in addition to the natural dissipation of alcohol over time, the defendant in that case "had suffered injuries in an automobile accident and was taken to the hospital." 133 S.Ct. at 1559 *citing* 384 U.S. at 758. The Court in *McNeely* quoted with approval the language from *Schmerber* that the warrantless blood test in that case was "nonetheless permissible because the officer 'might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence.'" 133 S.Ct. at 1560 *quoting* 384 U.S. at 770 (internal quotations omitted). That same reasoning would seem to apply to the facts of this case involving one fatality, a seriously injured passenger and an operator in the ambulance on his way to the hospital.

It should also be noted that the opinion in *Missouri v. McNeely* is a somewhat fractured one, as evidenced by the fact that Justice Kennedy concurred in part and Chief Justice Roberts concurred in part and dissented in part, joined by Justices Breyer and Alito. Justice Thomas dissented. In his concurring opinion, Justice Kennedy pointed out that the Court's opinion "ought not to be interpreted to indicate this question is not susceptible of rules and guidelines that can give important, practical instruction to arresting officers, instruction that in any number of instances would allow a warrantless blood test in order to preserve the critical evidence." 133 S.Ct. at 1569. He went further and remarked that "[s]tates and other governmental entities which enforce the driving laws can adopt rules, procedures, and protocols that meet the reasonableness requirements of the Fourth Amendment and give helpful guidance to law enforcement officials." *Id.*

Nevertheless, the Defendant contends that the Supreme Court's decision in *Birchfield v. North Dakota* definitively signals the constitutional demise of section 2522. The question before the Court in *Birchfield* was whether laws that "make it a crime for a motorist to refuse to be tested after being lawfully arrested for driving

while impaired . . . violate the Fourth Amendment's prohibition against unreasonable searches." 136 S.Ct. at 2166-67. None of the three cases before the Court in *Birchfield* involved an emergency situation of any kind, let alone anything even remotely approaching the crash in Mount Vernon on May 12, 2013. Indeed, the "exigent circumstances" exception to the warrant requirement was never considered in *Birchfield*. Rather, the Court in *Birchfield* only addressed "how the search-incident-to-arrest doctrine applies to breath and blood tests incident to such arrests." *Id.* at 2174.

In that context, the Court examined breath and blood tests and reaffirmed that breath tests do not implicate significant privacy interests, but taking a blood sample by piercing the skin does. 136 S.Ct. at 2177-78. The Court then balanced the privacy interests against the government's "paramount interest . . . in preserving the safety of . . . public highways." *Id.* at 2178 *quoting MacKay v. Montrym,* 443 U.S. 1, 17 (1979). Ultimately, the Court held that the Fourth Amendment permits a warrantless breath test incident to an arrest for drunk driving, but not a warrantless blood test. The Court made it clear, however, that the police may rely on the exigent circumstances exception to the warrant requirement, if it applies.

The taking of the Defendant's blood here was not done pursuant to the search-incident-to arrest doctrine. Rather, it was authorized by the statutory requirement of 29-A M.R.S. §2522, since the police were aware at the scene that a fatality had occurred as a result of the crash.

It is possible that, in light of *Missouri v. McNeely* and/or *Birchfield v. North Dakota,* the Court would view section 2522 as invalid because it reflects a *per se* legislative declaration of an exigency whenever a fatal or likely fatal accident has occurred, whereas *McNeely* requires a case-by-case assessment of the facts

surrounding the alleged exigent circumstances.[8] This court, however, is not yet convinced that the narrowly tailored circumstances addressed in 29-A M.R.S. §2522 would be ruled unreasonable and therefore unconstitutional under the Fourth Amendment.

Unlike the cases considered by the Supreme Court in *Birchfield* and *McNeely*, section 2522 addresses only accidents involving a fatality or a likely fatality. Nothing is as grave; nothing is as urgent; nothing presents such critical choices in an emergency setting, as an accident scene where a person has just died or there are reasonable grounds to believe that a person will die. For the Legislature of Maine to determine that such a situation represents an emergency and that in such a limited and exigent situation a blood sample from all involved operators must be taken as soon as practicable is, in this court's opinion, unquestionably reasonable.[9]

The Defendant's Motion to Suppress (Consent Issue) is denied.

## III. Motion In Limine To Exclude Medical Records & Blood Obtained From Hospital

By virtue of this motion the Defendant seeks to exclude from evidence: (1) the test results obtained by CMMC from his blood sample taken at the hospital, and; (2) the test results obtained by HETL on the blood sample taken from him at CMMC. The Defendant contends that the test results from CMMC are unreliable and should not be admitted pursuant to 16 M.R.S. §357. Moreover, he maintains that the testing by HETL on the hospital blood sample should be excluded because the State cannot satisfy the chain of custody requirement that the sample is actually his and was properly collected.

---

[8] *Cf. State v. Romano,* 800 S.E.2d 644, 653-54 (N.C. 2017) (statute allowing blood test from person who is unconscious or otherwise incapable of refusing test is unconstitutional as creating a categorical exception to the warrant requirement).

[9] This case is distinguishable from *United States v. Hutchinson,* 2018 U.S. Dist. LEXIS 7180, *16 (D. Me.) (Hornby, J.), because the Coast Guard regulations at issue there did not authorize a compulsory blood draw in fatality cases.

The State opposes the motion on the ground that the test results from CMMC are admissible in accordance with 16 M.R.S. §357, which provides in pertinent part:

> Notwithstanding this section, the result of a laboratory or any other test kept by a hospital or other medical facility that reflects an alcohol level, a detectable urine-drug level, a detectable blood-drug level or a drug concentration of either blood or urine may not be excluded as evidence in a criminal or civil proceeding by reason of any claim of confidentiality or privilege and may be admitted as long as the result is relevant and reliable evidence if the proceeding is one in which the operator of a motor vehicle, snowmobile, all-terrain vehicle or watercraft is alleged to have operated under the influence of intoxicating liquor or drugs and the court is satisfied that probable cause exists to believe that the operator committed the offense charged.

As an initial matter, the Defendant has claimed that the testing for alcohol content done at CMMC is only a "screening" test. *See Motion In Limine at 2*. This argument, however, was not supported by the testimony at the hearing, which demonstrated that the analysis done by the Ortho Diagnostic Analyzer at CMMC was a confirmatory test and provided a numerical result in milligrams per deciliter.

Next, the Defendant asserts that the collection, storage and analysis done at CMMC is not in compliance with the DHHS regulations and the statute governing the administration of tests of blood samples for blood alcohol levels. *See* DHHS Regulations, 10-144, chapter 270; 29-A M.R.S. §2514. The State, however, is not seeking to admit the CMMC tests result pursuant to the regulations or the statutory requirements set forth in Title 29-A. Rather, it is seeking to admit the CMMC test results under 16 M.R.S. §357. *See State v. Harnisch*, 607 A.2d 527, 529 (Me. 1992).

As noted by the Law Court in *Harnisch*, the test for alcohol content at CMMC was administered as part of the Defendant's hospital treatment. Thus, if the test result complies with the requirements of 16 M.R.S. §357, it is admissible regardless of whether the requirements of the DHHS regulations and 29-A M.R.S. §2524 were also met. The Defendant's argument would essentially mean that any hospital test

that reflects an alcohol level could not be admitted into evidence unless it meets the DHHS regulations and 29-A M.R.S. §2524. This argument appears to have been at least implicitly rejected in *Harnisch,* and would seem to directly conflict with the statutory language of 16 M.R.S. §357. Had the Legislature intended such a result it could easily have made that intent clear.

The Defendant also points to the ruling in *State v. Googoo,* 2001 Me. Super. LEXIS 119 (Delahanty, J.) for the proposition that hospital tests such as the one conducted by CMMC are unreliable. In the court's view, the Defendant has read too much into the *Googoo* ruling. In his decision, Justice Delahanty acknowledged that 16 M.R.S. §357 permits test results from hospitals to be admitted into evidence "because of the inherent reliability of hospital practices where doctors and healthcare personnel routinely rely upon records and test results for the purpose of treatment and rehabilitation of the patients, often in critical and life-threatening situations." 2001 Me. Super. LEXIS 119, *5. The primary purpose of such hospital tests "is not for admission as evidence in a criminal case." *Id.*

In *Googoo* the court found that the prosecution had presented no information whatsoever about the hospital test (other than the test result), including who took the sample, how it was taken, how it was transferred to the laboratory and what testing procedure was used. In short, the State did nothing to establish the reliability of the test result, which the statute expressly requires as a precondition to admissibility. In contrast, the State in this case presented evidence through the testimony of hospital personnel as to the identity of the phlebotomist who did the blood draw from the Defendant, the laboratory technician who received the sample and "ran" it through the Ortho Diagnostic Analyzer and the laboratory supervisor who provided information about the quality controls and regular maintenance of the analyzer equipment. While the witnesses may have had no independent memories of the Defendant's name or the date when he was in the hospital, they were able to rely

27

upon hospital records to confirm their involvement with the Defendant's treatment. Moreover, they were able to provide some detail as to how the blood draw was done, such as using an iodine swab. The witnesses also gave testimony about the importance of having hospital tests and procedures be accurate and reliable, because doctors and other healthcare providers depend on them in their treatment and diagnosis of patients.

The court finds that the State has satisfied the statutory requirements for the admission of the CMMC test result pursuant to 16 M.R.S. §357. Specifically, the court finds that the CMMC test result is relevant and reliable and that there is probable cause to believe that the Defendant was operating under the influence.

The Defendant's argument that the test result from CMMC is artificially high because it was conducted on serum or plasma rather than whole blood, goes to the weight of the evidence, not its admissibility under section 357. *See Harnisch*, 697 A.2d at 529.

Finally, for the reasons already stated the court rejects the Defendant's claim that the State has failed to establish a sufficient chain of custody linking the blood sample to him. The hospital witnesses described the bar-coding procedure that is used at CMMC to scan patient information into the computer system and matching the patient's wristband bar-code with any labels produced for testing purposes.

The Defendant's Motion In Limine To Exclude Medical Records & Blood Obtained From Hospital is denied.

## IV. Motion In Limine to Exclude HETL Blood Alcohol Testing Results & Testimony of Stephen J. Pierce

Finally, the Defendant seeks to exclude the HETL test results and Mr. Pierce's testimony on the basis that Mr. Godfrey has opined that Pierce did not follow standard operating procedures and protocols in the testing of the Defendant's blood samples. Based on the testimony from both Mr. Pierce and Mr. Godfrey, the court

28

concludes that the issues raised by the Defendant go to the weight of the evidence, not its admissibility. The two expert witnesses disagree as to their conclusions and it is up to the factfinder to assess the testimony and give it such weight as it deems appropriate.

The Defendant's Motion In Limine to Exclude HETL Alcohol Blood Testing Results & Testimony of Stephen J. Pierce is denied.

## CONCLUSION

The entry is:

Defendant's Motion to Suppress (Fruits of Search Warrants) is DENIED.

Defendant's Motion to Suppress (Consent Issue) id DENIED.

Defendant's Motion In Limine to Exclude Medical Records & Blood Sample Obtained from Hospital is DENIED.

Defendant's Motion In Limine to Exclude HETL Blood Alcohol Testing Results & Testimony of Stephen J. Pierce is DENIED.

Dated: October 16, 2018

William R. Stokes
Justice, Superior Court

29